DAVID L. COPAS *v.* COMMISSIONER OF CORRECTION
(15138)

PETERS, C. J., and CALLAHAN, BERDON, NORCOTT and KATZ, Js.

---

Argued March 15—decision released July 4, 1995

*James A. Killen*, assistant state's attorney, with whom, on the brief, were *Patricia A. Swords*, state's attorney, and *Jacqueline J. Footman*, assistant state's attorney, for the appellant (respondent).

*Christopher C. Sheehan*, deputy assistant public defender, for the appellee (petitioner).

KATZ, J. This is an appeal from the decision of the habeas court granting the petitioner, David Leroy Copas, a new trial on the basis that he had received ineffective assistance of counsel at the time he pleaded guilty to murder and that, but for defense counsel's deficient performance, the result of the proceeding would have been different. Because the habeas court denied the state certification to appeal, we must first decide whether the judgment of the habeas court is properly before us. If we conclude that the case is properly before this court, the dispositive issue becomes whether the deficient performance of the petitioner's counsel prejudiced the outcome of the proceedings that led to the judgment of conviction. More specifically, we must determine whether his counsel prejudiced the proceedings by advising him to plead guilty without first: (1) investigating his mental health history; (2) engaging in any meaningful plea negotiations with the state's attorney; and (3) advising him of potential defenses based on his mental defects or emotional disturbance. We affirm.

The habeas court reasonably could have found the following facts. On April 27, 1986, the body of a sixteen year old girl was discovered in an isolated, wooded area of Coventry. The victim had been stabbed several times and her head had been crushed with a rock. During the subsequent investigation, authorities detained the petitioner on April 29, 1986. While in police custody, the petitioner signed a detailed written statement. In his statement, the petitioner confessed to the following events. He and the victim had been together on the night of April 25, 1986, and the early morning of April 26, 1986. They had driven around aimlessly in the petitioner's car, smoked marijuana[1] and engaged in consensual sexual intercourse.

---

[1] The autopsy report indicated that the victim had not ingested any drugs or alcohol.

They eventually drove to Coventry, where, according to the petitioner, they stopped and smoked more marijuana. The victim began screaming at him, calling him diseased and accusing him of having infected her. She then pulled out a small knife and started swinging it at him, cutting his hand. He struck the victim and she fell down. She then kicked him in the groin. He grabbed the knife and stabbed the victim repeatedly. He then hit her head with a large rock.

On May 1, 1986, the petitioner was arrested and charged with murder in violation of General Statutes (Rev. to 1985) § 53a-54a.[2] The petitioner pleaded not guilty and elected a jury trial.

On May 5, 1986, attorney Jerry Gruenbaum, a self-described tax and corporate law specialist, filed an appearance on behalf of the petitioner. Both the petitioner and his mother alerted Gruenbaum to the petitioner's long history of mental, emotional and substance abuse problems. Gruenbaum subsequently examined the petitioner's school records and spoke by telephone to a psychiatrist with whom the petitioner had previously met. Although on June 11, 1986, Gruenbaum filed

---

[2] General Statutes (Rev. to 1985) § 53a-54a provides: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

a notice of intent to introduce expert testimony relating to the existence of a mental disease or defect pursuant to Practice Book § 759,[3] he never consulted such an expert. Gruenbaum had decided that, because the petitioner's mental disabilities did not rise to the level of insanity, no defense based on the petitioner's mental condition applied. Gruenbaum made no further attempt to investigate the petitioner's mental health and did not request an independent psychiatric evaluation. Furthermore, he did not mention any potential defense to the state's attorney.

On August 27, 1986, the state notified Gruenbaum in writing that "the only way that this case can be disposed of short of trial is that Mr. Copas plead guilty to the charge of murder with a recommendation of the maximum sentence." On October 7, 1986, the petitioner withdrew his prior plea and election and pleaded guilty to murder. During the plea canvass, the court emphasized that there was no plea agreement, that the state was free to recommend the maximum penalty of life imprisonment[4] and that "the

---

[3] Practice Book § 759 provides: "—— ——MENTAL DISEASE OR DEFECT INCONSISTENT WITH THE MENTAL ELEMENT REQUIRED FOR THE OFFENSE CHARGED

"If a defendant intends to introduce expert testimony relating to a mental disease or defect, or another condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall, within the time provided for the filing of pretrial motions or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. He shall also furnish the prosecuting authority with copies of reports of physical or mental examinations of the defendant made in connection with the offense charged, within five days after receipt thereof. The judicial authority may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

[4] General Statutes (Rev. to 1985) § 53a-35a provides in pertinent part: "IMPRISONMENT FOR ANY FELONY COMMITTED ON OR AFTER JULY 1, 1981: DEFINITE SENTENCES; TERMS AUTHORIZED. For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows . . . (2) for the class A felony of murder, a term not less than twenty-five years nor more than life; (3) for a class A felony other than murder, a term not less than ten years nor more than twenty-five years; (4) for a class B felony, a term not less than one year nor more than

[c]ourt would be free to impose whatever sentence the [c]ourt feels was fair under the circumstances." Therefore, the court gave the petitioner no assurance or indication of what it would do at sentencing. The court accepted the petitioner's guilty plea and continued the case for sentencing.

Thereafter, on November 4, 1986, at the petitioner's request, Gruenbaum submitted and argued a motion to withdraw as counsel. The court denied the motion. Before sentencing on November 19, 1986, the petitioner moved for permission to withdraw his guilty plea,[5] which the court also denied.

As part of the presentence investigation conducted pursuant to General Statutes § 54-91a and Practice Book § 909, the court ordered the courts diagnostic clinic to evaluate the petitioner. In response, Donald

twenty years, except that for a conviction under section 53a-55a, 53a-59 (a) (1), 53a-59a, 53a-70a, 53a-94a, 53a-101 (a) (1) or 53a-134 (a) (2), the term shall be not less than five years nor more than twenty years . . . ."

General Statutes § 53a-35b provides: " 'LIFE IMPRISONMENT' DEFINED. A sentence of imprisonment for life shall mean a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to subsection (f) of section 53a-46a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life."

[5] The reasons that the petitioner decided to change his plea and dismiss his defense counsel are in dispute. Gruenbaum told the court that the petitioner had found a new attorney, whose identity was not known, and had discovered new evidence that would show that he had not committed the murder. The petitioner claims that, because he became concerned about the quality of legal representation he was receiving from Gruenbaum, he decided to have Gruenbaum withdraw from the case and to withdraw his guilty plea. The petitioner's version is buttressed by the testimony of his mother, who also believed at that time that Gruenbaum's performance was deficient. In addition, the clinical evaluation report dated October 31, 1986, that was completed by the courts diagnostic clinic, states: "There also appears to be a conflict that the [petitioner] currently has between [himself] and [his] counsel. He has indicated serious concern that he would be obtaining a new attorney and has made allegations against [his] counsel before the Bar Association. Because of these allegations, the [petitioner] may in fact ask for a withdrawal of the plea resulting in possibly his guilty plea being withdrawn and going to trial. . . ."

Rilla, a psychiatric social work supervisor acting on behalf of the clinic, submitted a clinical evaluation of the petitioner. This report, which was largely derived from a previous report that Rilla had submitted in 1982 in connection with a previous charge of first degree larceny, described the petitioner as a troubled individual. According to Rilla, the petitioner had an unsettled and discordant childhood that had resulted in socialization and behavioral problems. The report further stated that the petitioner had begun meeting with psychologists and social workers at the age of eight and that he had a long history of substance abuse.[6]

At the sentencing hearing on November 19, 1986, the state emphasized the heinous nature of the crime and asked the court to impose the maximum sentence of sixty years incarceration. In addition, two members of the victim's family spoke to the court. Gruenbaum argued that the petitioner should be sentenced to forty years. He did not, however, remark on the petitioner's troubled history, mention Rilla's report or provide the court with any reason to be lenient. None of the petitioner's family was present at the sentencing hearing and, therefore, no one spoke on his behalf.[7] The trial court imposed a sentence of fifty years incarceration.

One year later, on November 2, 1987, the petitioner filed a pro se petition for a writ of habeas corpus. On February 1, 1991, he filed an amended petition, through counsel, alleging that ineffective assistance of counsel had made his conviction illegal. Specifically, the peti-

---

[6] In contrast, the presentence investigation report stated: "He is the product of a hard working and well meaning family, certainly not a victim of a hopeless upbringing." Although both reports were submitted to the court, the apparent discrepancy between them was not brought to the attention of the court, and the court mentioned only the presentence investigation report as a basis for sentencing.

[7] At the habeas corpus hearing, the petitioner's wife and mother testified that they had not been advised of the date at which the sentencing hearing was to take place.

tioner alleged that Gruenbaum had been unqualified to represent him in a murder case, and that Gruenbaum had: (1) failed adequately to consult with the petitioner and advise him of relevant evidence and potential defenses; (2) misled and misinformed the petitioner as to the consequences of his guilty plea; (3) failed adequately to inquire into and develop evidence of the petitioner's mental state at the time of the offense; (4) failed to obtain a qualified expert's independent evaluation of the petitioner's mental state; and (5) failed vigorously and effectively to present evidence concerning the petitioner's mental state to the prosecuting attorney or the trial court during the appropriate pretrial proceedings and sentencing. The petitioner claimed that, but for Gruenbaum's inadequate representation, "there is a reasonable probability that the proceeding would have had a different outcome in that the petitioner would not have entered his guilty plea, a more favorable plea agreement could have been obtained, and/or the trial court would have imposed a lesser sentence." Accordingly, the petitioner asked for a new trial.

At the habeas corpus hearing beginning on January 21, 1992, the testimony included the results of an independent psychiatric evaluation of the petitioner and expert legal opinions regarding the constitutional right to effective assistance of counsel. Although the habeas court determined that Gruenbaum had never requested an independent psychiatric evaluation because he did not feel that any psychiatrically oriented defenses applied, the court also determined that Gruenbaum did not have sufficient knowledge of criminal law to make such an assessment. The habeas court noted that during his testimony at the habeas hearing, "[a]ttorney Gruenbaum was unable to define 'extreme emotional disturbance.' He was unable to set forth the elements of the crime of murder. It became apparent that trial counsel, at best, was confused about presenting an affirmative defense based upon mental disease or defect. . . . Mr. Gruenbaum's testimony at the habeas

corpus trial indicated that he did not know or appreciate the differences between 'insanity,' 'extreme emotional disturbance' and 'diminished capacity.' He was unable to distinguish between the clinical evaluation and the presentence report."

The habeas court then focused on Gruenbaum's performance pertaining to the petitioner's sentencing and concluded that "[t]rial counsel's conduct in preparing for and in his presentation of the sentencing hearing was not reasonably competent nor was it within the range of competence of Connecticut attorneys practicing criminal law in 1986." Citing *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984), the habeas court articulated the standard for determining whether a petitioner has been deprived of his constitutional right to effective assistance of counsel. Under *Strickland,* the petitioner must show that: (1) defense counsel's performance was not reasonably competent or within the range of competence expected of attorneys with ordinary training and skill in criminal law; id., 687–88; and (2) but for counsel's substandard performance, there is a reasonable probability that the result of the proceeding would have been different. Id., 694. Applying this standard, the habeas court determined that "[b]ased upon all of the evidence presented at the habeas corpus trial, it is the conclusion of the court that there is a reasonable probability that, but for Gruenbaum's incompetent representation of the petitioner the result of the proceeding would have been different." After reaching this determination the court did not consider any of the petitioner's other claims. Judgment was rendered in favor of the petitioner and his conviction of murder was vacated.

The respondent petitioned the habeas court for certification to appeal, and the habeas court granted cer-

tification.[8] Thereafter, the respondent appealed from the judgment of the habeas court to the Appellate Court. The respondent first challenged the habeas court's conclusion that the petitioner's trial counsel had been ineffective. Second, the respondent claimed that, even if the habeas court properly had determined that the petitioner had received ineffective assistance of counsel at sentencing, the proper remedy was to order a new sentencing hearing rather than to vacate the conviction.

The Appellate Court affirmed the habeas court's finding that Gruenbaum had provided inadequate representation at sentencing and that, had the petitioner's counsel been effective, the outcome of the sentencing hearing "might have been different." *Copas* v. *Warden*, 30 Conn. App. 677, 685–86, 621 A.2d 1378, cert. denied, 226 Conn. 901, 625 A.2d 1374 (1993). The court determined, however, that the habeas court's finding that counsel was ineffective at sentencing constituted an insufficient basis for overturning the conviction. The Appellate Court noted that the habeas court's decision was based on Gruenbaum's performance during the penalty phase of the proceedings and did not address any of the petitioner's other claims, which included the allegation that ineffective assistance of counsel during the plea process had precipitated the petitioner's decision to plead guilty. Id., 687. Therefore, the Appellate Court remanded the case to the habeas court for consideration of these claims, concluding that "[i]f the habeas court determines that there was ineffective

---

[8] General Statutes § 52-470 provides in pertinent part: "(b) No appeal from the judgment rendered in a habeas corpus proceeding brought in order to obtain his release by or in behalf of one who has been convicted of crime may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or a judge of the supreme court or appellate court to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

assistance of counsel at the time of the petitioner's conviction, then the habeas court may properly vacate the judgment of conviction.'' Id., 688.

Following the remand, in a supplemental memorandum of decision dated May 16, 1994, the habeas court concluded that the petitioner had received ineffective assistance of counsel at the time of his guilty plea. The court noted that Gruenbaum had been alerted to the petitioner's troubled history by the petitioner himself and by his mother, but Gruenbaum nevertheless had failed to conduct any meaningful investigation into the petitioner's mental state. The habeas court determined that Gruenbaum had not understood or identified the petitioner's potential defenses and found that the only substantive insight into the petitioner's mental health had been in the courts diagnostic clinic report, which had been ordered by the trial court. Consequently, the habeas court concluded that the failure by the petitioner's counsel to request a state funded expert mental health evaluation, in addition to his failure to identify and understand the petitioner's potential defenses, constituted substandard professional conduct. The habeas court ruled that Gruenbaum's failure to understand and investigate the petitioner's potential defenses had precluded any meaningful pretrial discussions with the state's attorney and that ''[t]here is a reasonable probability that, but for Gruenbaum's unprofessional errors, the result of the proceeding would have been different. *Strickland* v. *Washington,* [supra, 466 U.S. 694]. Certainly [the] petitioner's decision to plead guilty to murder was not an informed decision.'' Accordingly, the habeas court vacated the conviction and ordered a new trial.

The respondent petitioned the habeas court for certification for appellate review pursuant to General Statutes § 52-470 (b). See footnote 8. The habeas court denied certification and the respondent appealed to the

Appellate Court, claiming that it was improper for the habeas court to deny certification and to grant the habeas corpus petition. The appeal was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

We must decide the following two issues: (1) whether this court has jurisdiction to review the judgment despite the habeas court's denial of the respondent's petition for certification; and (2) whether the habeas court properly concluded that the petitioner had demonstrated that he had been prejudiced by his counsel's ineffective assistance at the time of his conviction.

## I

We must first decide whether this court should review the decision of the habeas court. We have previously determined that if either the petitioner or the respondent is denied a timely request for certification to appeal from a habeas court's judgment, such review may subsequently be obtained only if the appellant can demonstrate that the denial constituted an abuse of discretion. *Simms* v. *Warden*, 229 Conn. 178, 189, 640 A.2d 601 (1994). We recognize that "[i]n enacting § 52-470 (b), the legislature intended to discourage frivolous habeas appeals." *Simms* v. *Warden*, 230 Conn. 608, 616, 646 A.2d 126 (1994). A habeas appeal that satisfies one of the criteria set forth in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), is not, however, frivolous and warrants appellate review if the appellant can show: " 'that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further.' (Emphasis in original; internal quotation marks omitted.)" *Simms* v. *Warden*, supra, 616, quoting *Lozada* v. *Deeds*, supra, 432. Thus,

if an appeal is not frivolous, the habeas court's failure to grant certification to appeal is an abuse of discretion. *Simms* v. *Warden*, supra, 616.

In this case, the habeas court expressly determined that Gruenbaum had not provided adequate legal representation to the petitioner during the plea process and that the petitioner's plea had not been an informed decision. The court cited summarily, however, to the prejudice prong of *Strickland* v. *Washington*, supra, 466 U.S. 694, stating that "[t]here is a reasonable probability that, but for Gruenbaum's unprofessional errors, the result of the proceeding would have been different." The habeas court provided no further analysis. Although *Strickland* applies generally to the evaluation of whether ineffective assistance of counsel during criminal proceedings has infringed on a petitioner's constitutional rights, the United States Supreme Court has articulated a modified prejudice standard for cases in which the conviction has resulted from a guilty plea. See *Hill* v. *Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). *Hill* requires the petitioner to demonstrate that he would not have pleaded guilty, that he would have insisted on going to trial, and that the evidence that had been undiscovered or the defenses he claims should have been introduced were likely to have been successful at trial. Id., 59. The habeas court did not explain how the petitioner had met this burden of demonstrating prejudice. Indeed, the court did not refer to *Hill* in its supplemental memorandum of decision or otherwise discuss these factors set forth in *Hill*. Thus, it is not clear whether the petitioner satisfied the proper prejudice standard and we conclude, therefore, that the issue of whether the habeas court applied the proper standard is debatable among jurists of reason. Accordingly, we conclude that this appeal is not frivolous, that the habeas court's denial of the

respondent's petition for certification constituted an abuse of discretion and, therefore, that this appeal is properly before us.

## II

We next consider the respondent's claim that the petitioner has not shown, as required by the *Hill-Strickland* standard, that, but for defense counsel's failure to investigate potential defenses of mental incapacity and extreme emotional disturbance, he would have proceeded to trial rather than pleaded guilty. The respondent also contends that the petitioner has failed to demonstrate that any such defense would have been likely to succeed at trial and asserts that the outcome of this case would have been the same regardless of the competence of the petitioner's counsel.[9] We disagree.

We begin our analysis with the standard of appellate review of habeas corpus proceedings. The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. *Phillips* v. *Warden*, 220 Conn. 112, 131, 595 A.2d 1356 (1991). Historical facts constitute a recital of external events and the credibility of their narrators. "So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense." *Townsend* v. *Sain*, 372 U.S. 293, 309 n.6, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963). Whether the representation a defendant received at trial was constitutionally inadequate is

---

[9] The respondent has not challenged the habeas court's finding that Gruenbaum's failure to obtain an independent psychiatric evaluation of the petitioner and his lack of understanding of the potential defenses to murder constituted ineffective assistance of counsel, that the ineffective assistance of counsel precluded any meaningful plea negotiations and that the petitioner's decision to plead guilty was not an informed one. Therefore, only the second prong of the *Hill-Strickland* standard, regarding the prejudicial effect of the ineffective assistance of counsel, is at issue in this case.

a mixed question of law and fact. *Strickland* v. *Washington,* supra, 466 U.S. 698. As such, that question requires plenary review by this court unfettered by the clearly erroneous standard. *Cuyler* v. *Sullivan,* 446 U.S. 335, 342, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); *Phillips* v. *Warden,* supra, 131; see *Mannhalt* v. *Reed,* 847 F.2d 576, 579 (9th Cir.), cert. denied, 488 U.S. 908, 109 S. Ct. 260, 102 L. Ed. 2d 249 (1988) (appellate court reviews de novo habeas court's decision to grant or deny petition); *Virgin Islands* v. *Zepp,* 748 F.2d 125, 134 (3d Cir. 1984) (whether defendant received constitutionally inadequate assistance of counsel is mixed question of law and fact to which clearly erroneous standard does not apply).

A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington,* supra, 466 U.S. 686. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. *Baez* v. *Commissioner of Correction,* 34 Conn. App. 236, 242–43, 641 A.2d 147, cert. denied, 231 Conn. 905, 648 A.2d 148 (1994). Pretrial negotiations implicating the decision of whether to plead guilty is a critical stage in criminal proceedings; *Colson* v. *Smith,* 438 F.2d 1075, 1078 (5th Cir. 1971); and plea bargaining is an integral component of the criminal justice system and essential to the expeditious and fair administration of our courts. *Blackledge* v. *Allison,* 431 U.S. 63, 71, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977); see *Statewide Grievance Committee* v. *Whitney,* 227 Conn. 829, 842, 633 A.2d 296 (1993). "[Plea bargaining] leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are

prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned.'' (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Whitney*, supra, 842.

Commentators have estimated that between 80 and 90 percent of criminal cases in Connecticut result in guilty pleas, the majority of which are the product of plea bargains. M. Heumann, Plea Bargaining: The Experiences of Prosecutors, Judges and Defense Attorneys (1978) pp. 27–28. Thus, almost every criminal defendant is faced with the crucial decision of whether to plead guilty or proceed to trial. Although this decision is ultimately made by the defendant, the defendant's attorney must make an informed evaluation of the options and determine which alternative will offer the defendant the most favorable outcome. A defendant relies heavily upon counsel's independent evaluation of the charges and defenses, applicable law, the evidence and the risks and probable outcome of a trial. The right to effective assistance of counsel includes an adequate investigation of the case to determine facts relevant to the merits or to the punishment in the event of conviction. *Siemon* v. *Stoughton*, 184 Conn. 547, 556 n.3, 440 A.2d 210 (1981).

In *Strickland* v. *Washington*, supra, 466 U.S. 668, the United States Supreme Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel during criminal proceedings: the defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; id., 687–88; and (2) that defense counsel's deficient performance prejudiced the defense. Id., 694. The petitioner in *Strickland* had argued that the applicable standard for showing prejudice should be that the error impaired

the presentation of the defense. The court expressly rejected that standard, concluding that it provided no workable principle. Id., 693. The court also expressly rejected the outcome-determinative standard: that counsel's conduct more likely than not altered the outcome in the case. Id., 693–94. "An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id., 694. Accordingly, relying on the test for materiality of exculpatory information not disclosed to the defense, the court reached a compromise that requires a petitioner to demonstrate that there is a reasonable probability that the result of the proceedings would have been different had it not been for counsel's deficient performance. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

The court imposed this prejudice requirement because "[t]he government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were

unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." Id., 693.

In *Hill* v. *Lockhart*, supra, 474 U.S. 57–58, the court determined that the same two-part standard applies to claims arising from the plea negotiation process and that the same justifications for imposing the prejudice requirement in *Strickland* were relevant in the context of guilty pleas. Although the first half of the *Strickland* test remains the same for determining ineffective assistance of counsel at the plea negotiation stage, the court modified the prejudice standard. As in *Strickland,* the prejudice standard for plea negotiations is intended to determine whether, but for counsel's constitutionally deficient performance, the outcome of the plea process would have been different. The court went on to require that "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id., 59.

The *Hill* court also stated that the petitioner must show that such a decision to plead not guilty would have been based on the likelihood that the introduction of the evidence or the defense that was not identified because of ineffective assistance of counsel would have been successful at trial. Id. The court stated that "[i]n many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate . . . the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in

turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial."[10] Id.

We, therefore, examine whether the petitioner has shown that, but for the ineffective assistance of counsel, he would not have pleaded guilty to murder and would have gone to trial. In this case, the ineffective assistance of counsel involved both the failure to investigate and the failure to advise the petitioner of potential defenses. We conclude that the petitioner has shown that had his counsel adequately investigated and advised him of his potential defenses to murder, he would not have pleaded guilty to murder and would have gone to trial.

---

[10] We note that the prejudice standard set forth in *Strickland* was revisited by the United States Supreme Court in *Lockhart* v. *Fretwell*, 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The court summarized *Strickland* as requiring " 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " Id., 369, quoting *Strickland* v. *Washington*, supra, 466 U.S. 687. "Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart* v. *Fretwell*, supra, 369. *Fretwell* has been interpreted as narrowing the scope of the ineffective assistance of counsel doctrine and thereby limiting the availability of habeas relief. See, e.g., *Armstead* v. *Scott*, 37 F.3d 202, 207 (5th Cir. 1994), cert. denied,     U.S.    , 115 S. Ct. 1709, 131 L. Ed. 2d 570 (1995). We interpret *Lockhart*, however, as a clarification of *Strickland* and conclude that it has no impact on the modified prejudice standard articulated in *Hill*. To satisfy the *Hill* standard, a defendant must prove that, but for defense counsel's deficient performance, there is a reasonable probability that he would have pleaded not guilty and proceeded to trial on the basis of the likelihood that his defenses would succeed in providing a more favorable outcome. We believe that if a defendant can satisfy the modified prejudice standard in *Hill*, he has implicitly proven that the results of the plea proceeding were fundamentally unfair.

First, as the habeas court pointed out, Gruenbaum failed to conduct any meaningful investigation of the petitioner's mental health history, although he had been informed by the petitioner and the petitioner's mother that the petitioner had a troubled past that included mental and emotional problems and extensive and prolonged substance abuse.[11] The only such evaluation provided to the trial court, prepared by a social worker, had been requested by the court itself after the petitioner already had pleaded guilty. The state's attorney, Donald Caldwell, testified that Gruenbaum had never raised any potential defense during plea negotiations.

Had Gruenbaum investigated the petitioner's history of mental illness, he would have gathered significant information pertaining to a mental defect defense. In preparation for the habeas hearing, the petitioner was evaluated by Kenneth Selig, an adult clinical and forensic psychiatrist. Selig testified that the courts diagnostic clinic report was deficient because it included no psychological testing and did not provide any evaluation of possible organic brain damage.[12] In addition, Selig's testimony at the habeas hearing revealed substantial information regarding the petitioner's mental health that had not been included in the diagnostic clinic report.

---

[11] At the habeas hearing, in response to a question from the court regarding whether she had ever indicated to Gruenbaum that the petitioner had mental problems, the petitioner's wife also testified that she had told Gruenbaum several times that something was wrong with her husband.

[12] The petitioner suffered a number of head injuries during his childhood. When the petitioner was in the sixth grade, he was knocked unconscious in a sledding accident. Afterwards, he began to speak oddly in class and was taken to the hospital. When he was in the ninth grade, he fell from a ceiling, landed on his head and remained unconscious for one and one-half days. He later received another head injury that had required stitches over his right eye. Although Rilla's diagnostic clinic report refers to these incidents, it concludes, without an articulated reason, that the petitioner suffered from no organic brain damage. This statement was qualified, however, with a parenthetical clarification that it was "a non-medical opinion."

In Selig's opinion, the petitioner was mentally ill. Selig characterized the petitioner as having significant psychiatric problems that have persisted during his adult life, and diagnosed the petitioner as suffering from alcohol abuse, cannabis abuse, atypical impulse control and a mixed personality disorder with paranoid, narcissistic and antisocial features. He stated with reasonable medical certainty that the petitioner was suffering from the same psychological problems in April, 1986.

Selig also testified that the petitioner's afflictions become substantially worse when he is under stress and that in April, 1986, "in general his life was chaotic." The petitioner had been experiencing marital problems, substance abuse, unemployment and increasing financial instability. Selig testified that, as a consequence of the petitioner's mental illness and the stressors he was experiencing in April, 1986, the petitioner would likely have misinterpreted the intentions of others and would have become provoked in situations in which a healthy person would perceive no reason for provocation. Because of his atypical impulse disorder, the petitioner had a diminished capacity to control his behavior after provocation. Selig concluded, with a reasonable degree of medical certainty, that the petitioner was mentally ill and had suffered from a severely diminished capacity to control his behavior in April, 1986. Gruenbaum's failure to investigate caused this mental illness to remain undetected.

Gruenbaum also failed to inform the petitioner of any potential mental defect defenses, in part because of his own failure to conduct an adequate investigation, and in part because of his own misunderstanding of such defenses. Gruenbaum advised the petitioner to plead guilty under the mistaken assumption that the only

mental defense available to him was insanity.[13] He had never considered or explained to the petitioner the defenses of extreme emotional disturbance or intoxication. The habeas court determined that the petitioner's decision to plead guilty was not an informed decision, and the respondent does not challenge this conclusion.

It is reasonable to assume that, had the information regarding the petitioner's mental illness been revealed through a proper investigation, it would have been presented to the state's attorney during plea negotiations and would have weighed in defense counsel's recommendation regarding how the petitioner should plead. At the habeas hearing, the respondent asked Caldwell a hypothetical question that involved a defendant charged with murder who had presented evidence of the same psychological problems that Selig had attributed to the petitioner. The respondent asked Caldwell whether he would have offered to such a defendant a more lenient sentence or offered to charge a lesser offense in exchange for a guilty plea. Caldwell stated unequivocally that he would have handled the case

[13] There was contradictory testimony at the habeas hearing regarding why the petitioner had pleaded guilty. Gruenbaum testified at the hearing that the petitioner had pleaded guilty because he feared that details of his sexual conduct with the victim would be publicized during a trial, and that prison inmates would learn of it and seek retribution against him. In contrast, the petitioner testified that he pleaded guilty because Gruenbaum had told him repeatedly that it was the only way the petitioner could obtain a sentence of less than sixty years imprisonment. The petitioner's mother also testified that Gruenbaum had informed her that the petitioner had no defense and that his only option had been to plead guilty. The habeas court determined in the context of the plea process that, but for Gruenbaum's ineffective assistance of counsel, there was a reasonable probability that "the result of the proceeding would have been different." If the habeas court had believed that the petitioner had pleaded guilty to avoid publicity, it would have had to conclude that the outcome of the plea process would have been the same had counsel been effective. Therefore, the habeas court implicitly credited the petitioner's testimony regarding why he had pleaded guilty.

exactly the same way and would not have considered offering a charge of manslaughter or any lesser offense in exchange for a guilty plea. We assume that the habeas court credited this testimony. Therefore, the petitioner would have had the choice of pleading guilty to murder, knowing that the state would argue for the maximum sentence, or, in the hope of securing a more favorable outcome, pleading not guilty, proceeding to trial and relying on defenses related to his mental illness and emotional vulnerability.

There were several defenses that the petitioner could have raised. Extreme emotional disturbance is an element of first degree manslaughter; General Statutes § 53a-55;[14] and is an affirmative defense to murder. See footnote 2. In addition, a defendant who has committed murder while in a state of self-induced intoxication[15] may offer evidence of such intoxication to negate the element of intent. General Statutes § 53a-7.[16] Further-

[14] General Statutes § 53a-55 provides: "MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

[15] The petitioner testified that he had consumed an indeterminate amount of whiskey and smoked approximately thirteen marijuana cigarettes during the period of time in question.

[16] General Statutes § 53a-7 provides: "EFFECT OF INTOXICATION. Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime

more, the inability to control one's conduct within the requirements of the law that is not induced by voluntary intoxication is an affirmative defense. General Statutes § 53a-13;[17] see *State* v. *Joyner*, 225 Conn. 450, 460–65, 625 A.2d 791 (1993). Accordingly, it is clear that pleading guilty to murder was not the petitioner's only viable option.

We must next decide whether the aforementioned defenses would likely have succeeded at trial.[18] *Hill* v.

charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

[17] General Statutes § 53a-13 provides: "LACK OF CAPACITY DUE TO MENTAL DISEASE OR DEFECT AS AFFIRMATIVE DEFENSE. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

"(b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a licensed practitioner, as defined in section 20-184a, and was used in accordance with the directions of such prescription.

"(c) As used in this section, the terms mental disease or defect do not include (1) an abnormality manifested only by repeated criminal or otherwise antisocial conduct or (2) pathological or compulsive gambling."

[18] The likelihood of a successful outcome at trial has been interpreted to include either the likelihood of acquittal or the likelihood of a more favorable sentence. In *Hill* v. *Lockhart,* supra, 474 U.S. 59, after the court explained that "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial," the court cited to *Evans* v. *Meyer,* 742 F.2d 371, 375 (7th Cir. 1984), as an example. In *Evans* v. *Meyer,* supra, 375, a case involving an allegation of ineffective assistance of counsel during the plea process, the court found it inconceivable that the defendant's potential defense of intoxication would have resulted in an acquittal or, if the defendant had been convicted as charged, that he would have been given a shorter sentence than he actu-

*Lockhart,* supra, 474 U.S. 59. The petitioner argues that, on the basis of the evidence of his mental illness adduced at the habeas hearing, he could have established that he was guilty of the crime of manslaughter in the first degree on the basis of extreme emotional disturbance rather than murder.[19] We agree.

In order to prevail on that defense, the petitioner must prove, "by a preponderance of the evidence, that

ally received. This implies that, under the *Hill* prejudice requirement, the petitioner must show that the decision to plead not guilty would have been based on the likelihood that either: (1) the defense would result in an acquittal of the charged offense; or (2) the defense would result in a lesser sentence than what the petitioner ultimately received. This dual outcome analysis has been applied by other courts, after *Hill,* to evaluate whether the prejudice standard has been satisfied in a particular case. See, e.g., *Creech* v. *Arave,* 928 F.2d 1481, 1487 (9th Cir. 1991), rev'd in part on other grounds, 507 U.S. 463, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993), quoting *Evans* v. *Meyer,* supra, 375; *Ames* v. *New York State Division of Parole,* 772 F.2d 13, 16 (2d Cir. 1985), cert. denied, 475 U.S. 1066, 106 S. Ct. 1379, 89 L. Ed. 2d 605 (1986) (evaluating lesser included charges of which defendant could have been convicted if he had gone to trial and comparing sentence he received through plea bargaining to potential sentence he would have received if he had gone to trial to determine whether prejudice standard was satisfied); *Lyman* v. *Hopkins,* 875 F. Sup. 631, 642 (D. Neb. 1995) (in evaluating prejudice court must analyze: [1] whether reasonable person would have gone to trial; [2] whether it is conceivable that defendant would have been acquitted at trial; and [3] "even if not acquitted, is it conceivable that the defendant would have been given a shorter sentence than he actually received"); *Isaraphanich* v. *United States,* 632 F. Sup. 1531, 1534 (S.D.N.Y. 1986) (finding no prejudice after reviewing both potential for acquittal and lesser sentence if defendant had not pleaded guilty and had gone to trial). Therefore, we interpret *Hill* to require the petitioner in this case to show that the defense that was not discovered or explained to him during the plea process would have likely resulted in either an acquittal, or a more favorable sentence following a conviction of the charged offense or of a lesser included offense.

[19] Although there are several possible defenses that the petitioner could have raised, the petitioner only briefed the potential of successfully raising an extreme emotional disturbance defense apparently because habeas counsel determined that it would have been the most viable. Therefore, we address only the defense of extreme emotional distress in our analysis regarding whether the petitioner had a reasonable probability of successfully raising a defense at trial based on his mental or emotional state.

he had committed the offense under the influence of an extreme emotional disturbance, and, that there was a reasonable explanation or excuse for his extreme emotional disturbance. In interpreting the meaning of the phrase extreme emotional disturbance, we have stated that the trier of fact must be persuaded that: (1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions." (Internal quotation marks omitted.) *State* v. *Patterson*, 229 Conn. 328, 340–41, 641 A.2d 123 (1994).

The determination of the reasonableness of a defendant's actions to support his affirmative defense of extreme emotional disturbance in a murder prosecution requires that circumstances be viewed from the viewpoint of a reasonable person in the defendant's situation and under the circumstances as the defendant believed them to be, rather than subjectively from the defendant's viewpoint. *State* v. *Ortiz*, 217 Conn. 648, 653, 588 A.2d 127 (1991). However, "the reasonable man yardstick is only used to determine the reasonableness of the explanation or excuse of the action of the defendant from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." (Internal quotation marks omitted.) Id. Thus, the statute " 'sets forth a standard that is objective in its overview, but subjective as to the defendant's belief . . . .' " Id. The extreme emotional disturbance defense is a considerably broader version of the common law defense of heat

of passion or sudden provocation. *Patterson* v. *New York*, 432 U.S. 197, 202, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). "[T]he defense does not require a provoking or triggering event; or that the homicidal act occur immediately after the cause or causes of the defendant's extreme emotional disturbance; or that the defendant have lost all ability to reason." *State* v. *Elliott*, 177 Conn. 1, 7, 411 A.2d 3 (1979).

The habeas court could reasonably have found credible the evidence presented by the petitioner that showed him as having persistently suffered from a wide range of psychological and emotional problems throughout his life. Selig testified that the petitioner suffers from a particular mental disorder that causes him to become easily provoked and unable to control himself once he becomes provoked. He was experiencing a series of additional stressors at the time of the crime, including marital problems, daily substance abuse and an inability to remain employed that exacerbated his mental instability. Although the totality of this evidence may not amount to a compelling extreme emotional disturbance defense, it need not approach that level of certitude because the petitioner must show only that a more favorable outcome was likely.[20] We conclude the habeas court reasonably could have found that, had the petitioner gone to trial instead of pleading guilty, it is rea-

[20] We note the dissent's recitation of evidence of the petitioner's actions immediately after the killing in support of its argument that this evidence undermines the likelihood that the jury would have found the defendant had proved the affirmative defense of extreme emotional disturbance. Jurors have been known, on more than one occasion, to convict a defendant of manslaughter rather than murder as charged, despite: (1) their obvious rejection of his version of events; see *State* v. *Hoeplinger,* 206 Conn. 278, 282–84, 537 A.2d 1010 (1988); *State* v. *Asherman,* 193 Conn. 695, 699–701, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); (2) proof of the defendant's attempts to conceal evidence; see *State* v. *Hoeplinger,* supra, 282–84; *State* v. *Asherman,* supra, 698–99; and (3) the defendant's calm appearance following the homicide. See *State* v. *Casey,* 201 Conn. 174, 177, 513 A.2d 1183 (1986).

sonably likely that the jury would have found him guilty of the lesser offense of manslaughter, or that, had he nevertheless been convicted of murder, the court would have imposed a lesser sentence in consideration of his mental afflictions.[21]

Finally, in the absence of any assurance or indication by the trial court of what sentence it considered appropriate, in light of the state's expressed decision to recommend the maximum sentence even were the petitioner to plead guilty,[22] and in light of the substantially different penalties involved,[23] it is clear that the petitioner had little incentive to plead guilty to murder. Furthermore, assuming the habeas court credited Caldwell's testimony that, despite the psychiatric and psychological evidence, the state nevertheless would have persisted in charging the petitioner with murder and would have argued for the maximum sentence, it is equally clear that the petitioner would have had no incentive to plead guilty.

In sum, the habeas court reasonably could have found that, because of this reasonable likelihood of a differ-

---

[21] Given similar facts, other state courts have come to the same conclusion. See, e.g., *State* v. *Savage*, 120 N.J. 594, 577 A.2d 455 (1990) (counsel's performance was ineffective and reasonable probability existed that jury would have reached different conclusion in capital murder case in which, despite defendant's extensive history of mental problems and drug abuse, counsel did not procure psychological examination, did not consult experts regarding possibility of psychiatric, diminished capacity or intoxication defenses, and failed to question defendant regarding drug use on night prior to murder).

[22] During the course of plea negotiations, Caldwell had informed Gruenbaum that he would accept nothing less than a plea of guilty to murder with the maximum penalty of sixty years imprisonment.

[23] The crime of murder, to which the petitioner pleaded guilty, is a class A felony that is punishable by a term of imprisonment of not less than twenty-five years and a maximum life term, which is defined as a term of sixty years. General Statutes §§ 53a-35a and 53a-35b; see footnote 4. First degree manslaughter is a class B felony, however, the maximum penalty for which is twenty years imprisonment. See footnotes 4 and 14.

ent outcome at trial and because of the fact that the petitioner had nothing to lose by proceeding to trial, it is reasonably probable that, but for the ineffective assistance of counsel, the petitioner would have elected not to plead guilty and instead to go to trial. We, therefore, conclude that the habeas court correctly determined that the petitioner was prejudiced by ineffective assistance of counsel at the time of his conviction. The petitioner has satisfied the prejudice requirement of the *Hill-Strickland* standard, and the habeas court, therefore, properly vacated the petitioner's conviction.

The judgment of the habeas court is affirmed.

In this opinion PETERS, C. J., and BERDON and NORCOTT, Js., concurred.

CALLAHAN, J., dissenting. I dissent in part II of the majority opinion. I agree with the majority that attorney Jerry Gruenbaum's representation of the petitioner, David Copas, fell below the standard of *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984). I disagree, however, with the conclusion of the majority that an affirmative defense posited by the petitioner likely would have been successful at trial.

In order for the petitioner to prevail on his claim of ineffective assistance of counsel, he must satisfy the "prejudice requirement" as set forth in *Hill* v. *Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. . . . [W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolu-

tion of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. See, e.g., *Evans* v. *Meyer*, 742 F.2d 371, 375 ([7th Cir.] 1984) ('It is inconceivable to us . . . that [the defendant] would have gone to trial on a defense of [extreme emotional disturbance], or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received.')." Id., 59.

The petitioner argues that had his attorney identified extreme emotional disturbance as a viable affirmative defense to murder, he would not have pleaded guilty to murder, and the defense likely would have succeeded. The majority agrees. It appears to me, however, that it is not likely that an extreme emotional disturbance defense would have been successful at trial and, consequently, the petitioner was not prejudiced by his counsel's shortcomings.

In order to prove a defense of extreme emotional disturbance, the petitioner would have had to demonstrate that any emotional disturbance he suffered had to be excessive and violent and rise to the *greatest degree of intensity* away from the norm. *State* v. *Elliott*, 177 Conn. 1, 9–10, 411 A.2d 3 (1979). That the petitioner's mental state rose to that level is belied by the evidence that immediately after killing the victim, he hid her body and rifled through her pocketbook, stealing her money and her jewelry. Moreover, the petitioner's friends who saw him shortly after the incident gave no indication that the petitioner was fleeing in horror upon the realization of what he had done while he was in an extremely emotionally disturbed state; rather, the petitioner was calmly going about the business of obtaining assistance to get his car started. These are hardly the actions of one who has just killed a fellow human being in the throes of extreme emotional disturbance.

Further, there is a question of credibility to be considered. The petitioner's confession claims that the victim "got [a knife] from somewhere" and attacked and cut him. There is a statement in the petitioner's presentence investigation report, however, that any cuts the petitioner suffered were from his own knife. Additionally, that same confession alleges that the petitioner and the victim drank alcohol and smoked marijuana together several times on the night of the murder. The autopsy report on the victim, however, indicated that she had not ingested any drugs or alcohol.

In short, the jury would have to close its eyes to the petitioner's actions and credit the petitioner's testimony regarding the victim's behavior on the night of the murder in order for the defense of extreme emotional disturbance to succeed. I do not believe that a reasonable jury would do so. I respectfully dissent.