[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner brings this petition for a writ of habeas corpus alleging that his criminal trial attorney, Howard Gemeiner, was ineffective in assisting him in that he failed to:
 (1) make an effective effort to retain an expert witness to corroborate that the petitioner was legally insane or suffering from an extreme emotional disturbance at the time of the alleged crime;
 (2) provide Dr. Scott Grove with sufficient background information and documentation of petitioner's mental history and mental state at the time of the alleged offense;
 (3) communicate with Dr. Grove and ascertain his professional opinion regarding whether petitioner was CT Page 4953 suffering from a mental disease or defect or extreme emotional disturbance;
 (4) introduce into evidence at trial Dr. Grove's testimony or the testimony of another competent mental health professional in support of the petitioner's claim that he was suffering from a mental disease or defect or extreme emotional disturbance at the time of the alleged offense;
 (5) effectively investigate the availability of other witnesses who were with the petitioner during the period leading up to, and at the time of, the commission of said petitioner's alleged offense, who could support the petitioner's claim that he was suffering from a mental disease or defect or extreme emotional disturbance;
 (6) effectively introduce into evidence at trial the testimony of other witnesses who were with the petitioner during the period leading up to, and at the time of; the commission of said petitioner's alleged offense to support the petitioner's claim that he was suffering from a mental disease or defect or extreme emotional disturbance; and
 (7) effectively argue to the jury in his summation that the petitioner was suffering from a mental disease or defect or extreme emotional disturbance at the time of his alleged offense.
The petitioner's arrest and conviction of the crimes of murder, assault in the first degree and assault in the second degree with a firearm resulted from the shooting death of Barry Antoni, the shooting of Cleto Antoni in the abdomen and the shooting of Patricia Antoni in the arm which shooting occurred in the Antoni residence on February 24, 1983 in Orange, Connecticut. Patricia, who knew the petitioner prior to these crimes, was the daughter of Cleto and the sister of Barry and identified the petitioner as the perpetrator.
The parties pre-marked the following exhibits as evidence: Transcript of the criminal trial testimony of Robin Crane, Petitioner's Exhibit 1; Report of C. Scott Grove, M.D., Petitioner's Exhibit 2; Transcript of the criminal trial testimony of the petitioner; Respondent's Exhibit A; transcript of the sentencing of the petitioner and Respondent's Exhibit B; and the transcript of Judge McGrath's instructions to the jury; Respondent's Exhibit C. CT Page 4954
The petitioner called three witnesses, his criminal trial attorney, Gemeiner, Attorney William Paetzold as an expert in criminal trial practice and C. Scott Grove, a psychiatrist, who had examined the petitioner prior to the criminal trial for the purpose of possible defenses as to state of mind.
Gemeiner testified that when he represented the petitioner in 1983 he had fourteen (14) years of practice mostly at the felony criminal level with about ten (10) trials through verdict but the petitioner's case was the first murder case tried to verdict. He had had two (2) other murder cases which, by preparation of the extreme emotional disturbance defenses, had been plea-bargained for manslaughter. The state had a strong case because the petitioner had intruded with another into the victim's home where he shot three (3) family members, killing one of them. His dispute was with Patty Antoni, whom he believed stole his brother's $100 while visiting with the petitioner in his brother's apartment. Patty's brother was killed, her father shot in the abdomen and Patty shot in the arm and breast. Because the state appeared not to be interested in plea bargaining, he explored state of mind defenses by requesting an examination by Dr. C. Scott Grove, a psychiatrist. The petitioner was articulate and bright as well as charming although with little formal education and therefore, he was optimistic that the defense of extreme emotional disturbance might be available to reduce the murder charge to manslaughter. However, Dr. Grove called him to tell him that the petitioner was not suffering from extreme emotional disturbance but was "evil to the core" or "evil incarnate" and that he was a cold-blooded killer and that you don't want my report and you don't want me to testify." He decided that the case was going nowhere but he had to go forward with the extreme emotional disturbance defense with the petitioner testifying about his criminal background from a dysfunctional family of an alcoholic father and a mother with emotional problems for which she was institutionalized. The petitioner had recently lost his girlfriend and a buddy by suicide and was beset by substance abuse. He hoped the petitioner could come across to the jury with enough sympathy to gain the lesser charge of manslaughter. Obviously it failed. See Respondent's Exhibit A. He felt he had no choice since Judge McGrath was known as a conservative judge who imposed the maximum penalty.
After the verdict Gemeiner contacted Dr. Grove to obtain a written report to see if there was something he could use for the sentencing. He was shocked when he received the report dated December 9, 1983, Petitioner's Exhibit 2. Dr. Grove's oral telephone report had been consistent with the facts Gemeiner had in evaluating the petitioner. CT Page 4955 The petitioner had told him that while shooting in the Antoni home the gun jammed and had it not, he would have shot them all. The petitioner also responded to Gemeiner's question if he had killed someone before, "don't ask me that question." Now Dr. Grove's report contains no language of an opinion that he is a "cold-blooded killer" but "The issue of Mr. Doehrer having been suffering from an `extreme emotional disturbance' at that time presents problems. Although the clinical evidence I obtained was not compellingly convincing, it was nevertheless too strong to be ruled out. Unfortunately I do not believe that further examination of this man would reveal enough clinical evidence to prove the point one way or the other; this evidence is inaccessible at this time." Gemeiner said he felt bagged. Had he been told this before the trial was over, he would have sought a second opinion.
Paetzold testified that where his client has been referred to a psychiatrist who cannot give a beneficial opinion, he will seek a second opinion. He felt that Dr. Grove's examination came too late to adjust to find another professional. Whereas here the evidence was overwhelming for the state's case and no favorable state of mind expert, he would consider his client as a witness with other state of mind evidence.
Dr. Grove testified that he does not know when he was first contacted by Gemeiner but he usually sees the patient within 3 to 4 weeks. His original practice consisted of such evaluations being requested by the defense amounting to 75% of the total to 25% by the state. It gradually increased in requests by the state until this year the only requests for evaluations were by the state.
The only dates he is positive of is the interview date of October 14, 1983 when he spent 2-1/2 hours in his interview of Doebrer and December 9, 1983, the date of his report. Considering his normal practice, he would have reviewed the material submitted to him on the day before the interview and called two days after the interview with an oral report and that he would have prepared his report the day prior to its date. He cannot account for the time delay of the report after the interview. He identified Petitioner's Exhibit 2 as his report and acknowledged that he was unable to determine one way or the other whether Doehrer suffered an extreme emotional disturbance on February 24, 1983. He claimed that he did not use such terms as "pure evil", "evil incarnate" or "cold-blooded killer" which are vitriolic terms, not professional terms. He would have told Gemeiner exactly what was in the report. CT Page 4956
After presenting these three witnesses, the petitioner requested a bifurcation of the hearing so as to have the court decide the first prong of the Strickland test for a new trial, whether defense counsel's performance was deficient. See Copas v. Commissioner of Correction, 234 Conn. 139, 141. Respondent offered no objection but wanted time to consider offering evidence. Subsequently, respondent rested without an offer of evidence. Despite the narrow parameters of both law and fact in which counsel offered the court to decided the issue of the first prong of Strickland, the offer was accepted.
In Strickland v. Washington, 466 U.S. 668, 687-88, the court adopted a two-part standard for evaluating claims of ineffective assistance of counsel during criminal proceedings: the defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that defense counsel's deficient performance prejudiced the defense. Although Dr. Grove was called as a witness in this habeas hearing, he did not testify as to any new examination of the petitioner but only to the events surrounding his examination of October 14, 1983 and the subsequent notification to counsel. Nor was there any other evidence demonstrating a favorable defense offered or to be offered. The petitioner takes Paetzold's testimony that Gemeiner should have pursued the extreme emotional disturbance defense for a second opinion. He is operating from hindsight that Dr. Grove could not say one way or another in his written report. However, there is nothing discrediting Gemeiner's testimony. He found that Dr. Grove's opinion that the petitioner was a cold-blooded killer to be consistent with his own opinion of the petitioner, a person who would have killed all his witnesses if his gun had not jammed. He would kill this girl whom he had befriended, who had stolen $100 from his brother and cocaine from his friend.
Dr. Grove leaves too many holes to make his testimony credible. He doesn't know when he assembled all the material for his examination. He had no intention to make a formal report until asked to do so for the sentencing. Now he can't include in his report those descriptive but unprofessional words in his report. So he equivocates. He can't find extreme emotional disturbance but he can't rule it out. He has examined the source material and another examination won't help.
Gemeiner had met a stone wall without the report of December 9, 1983. He had nothing to lose by attempting to put the petitioner on as a witness with the hope of eliciting some sympathy. Conditioned as he was to protect himself from childhood, the petitioner feared that he had been set up when the Antoni door didn't swing completely open. He hadn't intended to shoot innocent people but to protect himself from CT Page 4957 those he believed set him up to do harm. This facade, unfortunately for him, was uncovered by clever cross-examination. See Respondent's Exhibit A.
"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate this conduct from counsel's perspective at the time." Strickland v. Washington, supra, 689.
The affirmative defense was placed before the jury and an instruction was given. See Respondent's Exhibit C. The jury obviously rejected it. Because the petitioner has failed to carry his burden of proof on his claim of ineffective assistance of counsel, it is not necessary to reach the issue of prejudice since a petitioner must satisfy both parts of the test to justify review of his claim by a habeas court. Valeriano v. Bronson, 209 Conn. 75, 82.
For the above reasons, the petition is denied.
 Thomas H. Corrigan Judge Trial Referee