[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a habeas petition filed initially on May 20, 1991 in which the petitioner, Michael Carl Reddick claims that his present incarceration is illegal on the basis of his assertion that he was denied the effective assistance of counsel in the underlying criminal proceedings. By Amended Petition dated April 26, 1996, the petitioner claims that his trial counsel was ineffective in that he failed to properly lessen the suggestiveness and defend against an in-court identification, he failed to properly conduct, prepare or utilize a pretrial investigation, he failed to properly bring forth testimony and object to the exculpatory (sic) evidence of finger prints, hair samples and dye, and he failed to properly be prepared for trial. The petitioner additionally claims that his trial counsel improperly advised him and permitted a plea to enter on a CT Page 5123-IIII Persistent Dangerous Felony Charge. At the habeas hearing on this matter, the court heard witness testimony and also received exhibits into evidence, including the court transcript of the petitioner's criminal trial. Based on the evidence adduced at the habeas hearing, the court makes the following findings and order.
Following a jury trial, which concluded on February 28, 1991 in Docket Number CR22-01552 in the Superior Court for the Judicial District of Ansonia-Milford, the petitioner was convicted of Robbery in the Second Degree in violation of Connecticut General Statutes § 53a-135. Shortly after the jury returned its verdict, the petitioner entered a plea of nolocontendere to the charge of being a Persistent Dangerous Felony Offender in violation of C.G.S. § 53a-40(a)(1)(2)(A).
On May 13, 1991, the petitioner was sentenced to the Commissioner of Corrections to a period of confinement of twenty five years. The petitioner is currently an inmate in the custody of the Commissioner of Corrections.
The petitioner's conviction was upheld on appeal to the Supreme Court. cf. State v. Reddick, 224 Conn. 445 (1993).
In order for the petitioner to succeed in his claim that he was denied the effective assistance of counsel in the criminal proceedings, he has the burden of proving both that his trial counsel's performance was deficient and that he was actually prejudiced by his counsel's deficient performance. Strickland v.Washington, 466 U.S. 668 (1984), Bunkley v. Commissioner,222 Conn. 444 (1992), Copas v. Commissioner, 234 Conn. 139 (1995).
The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the Federal constitution and by Article First, Section 8 of the Connecticut constitution. In order to prove that his counsel's performance was deficient, the petitioner must, demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352 (1989). Competent representation is not to be equated with perfection. "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." Jeffrey v.Commissioner, 36 Conn. App. 216 (1994) (citations omitted). "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary CT Page 5123-JJJJ training and skill in the criminal law." (Citations omitted; internal quotations marks omitted.) Johnson v. Commissioner,36 Conn. App. 695 (1995).
The Strickland court also gave guidance to the trial bench for its assessment of ineffective claims. The Supreme Court opined: "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy'. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted.) Strickland v.Washington, supra, 466 U.S. 689-90; Quintana v. Warden, 220 Conn. 1
(1991); Williams v. Warden, 217 Conn. 419 (1991); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
With respect to the prejudice component of the Strickland
test, the petitioner must demonstrate that, ". . . counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable" Strickland v.Washington, supra 466 U.S. 687. Thus, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." Id., 693. Rather, a successful petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner, 234 Conn. 139 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome."Strickland v. Washington, supra 466 U.S. 694. "`When a CT Page 5123-KKKK [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"Fair v. Warden, 211 Conn. 398, 408 (1989); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
In the underlying criminal proceedings, the petitioner was represented, seriatim, by three different special public defenders. He was initially represented by Special Public Defender Vito Caslignoli against whom he filed a grievance and who was then replaced on September 21, 1990 by Special Public Defender Andrew Halpern. While represented by Attorney Halpern, and while in pre-trial custody, the petitioner filed a Motion for a Speedy Trial. On February 5, 1991, the matter having been called for trial, Attorney Halpern requested a continuance on the basis of his claim that his (then) current health condition would not enable him to proceed. In response, the court ordered that jury selection would go forward but that evidence would not commence until February 20, 1991. Subsequently, on February 6, 1991, the petitioner filed a motion to dismiss Attorney Halpern on the basis of his complaint that he had not received a copy of the investigative report which had been prepared on behalf of the petitioner. At this February 6th hearing, Attorney Halpern commented that he felt no better on this day than he had the day before. Petitioner's Exhibit 2, Trial Transcript (T), 29. The court denied the petitioner's motion to dismiss Attorney Halpern and the parties proceeded to jury selection.
On February 14, 1991, the parties again appeared before the court and reported that they had selected five jurors. Additionally, Attorney Timothy Aspinwall appeared with the petitioner and indicated to the court that he was ready to take over the representation of the petitioner, and to proceed on his behalf. (T. 267) Over the objections of the petitioner, the court confirmed Attorney Aspinwall's appointment as the petitioner's special public defender, but ordered Attorney Halpern to remain in the case "for now" and to cooperate with Attorney Aspinwall. (T. 274) Jury selection was continued to February 20, 1991 to give Attorney Aspinwall sufficient time to become familiar with the file.
When the parties returned to court on February 20, 1991, jury selection resumed. Since one of the jurors had been excused, the parties selected two additional jurors and two alternates. During these proceedings, Attorney Aspinwall requested a further CT Page 5123-LLLL continuance of two weeks. He indicated that he had met with Attorney Halpern over the weekend, and that he had requested Attorney Halpern to prepare a narrative summary of the file. (T. 284) Attorney Aspinwall also indicated that he had not spoken with the petitioner since the prior Thursday, though he had met with him for approximately one half hour before the commencement of court. (T. 285) The court, noting that there would be no session in the afternoon of February 20th when counsel could further talk with the petitioner, denied his request for a two week continuance. (T. 286) The court also denied a defense motion for mistrial. Id. On this date, the court permitted Attorney Halpern to withdraw.
One of the petitioner's claims is that counsel failed to be properly prepared for trial. A review of the entire transcript belies this assertion. The petitioner has pointed to no inadequacy in jury selection. The trial transcript reflects that both Attorney Halpern's and Attorney Aspinwall's activities during jury selection were professionally appropriate. Additionally, the transcript reflects that Attorney Aspinwall and Attorney Halpern met over the weekend preceding the commencement of evidence and that Attorney Halpern, pursuant to Attorney Aspinwall's request, had prepared a file summary. (T. 284) During the habeas hearing, the respondent introduced, as an exhibit, an investigative report which had been prepared on behalf of the petitioner while awaiting trial Respondent's Exhibit A. There is no reason for the court to believe, based on its review of the entire trial record, that this report was unavailable to Attorney Aspinwall and that he did not utilize its findings as a trial aid.
At trial, the State's evidence was that on January 24, 1990, the petitioner, along with Edward Singer, robbed a branch office of the Bank of Boston, located on Orange Avenue in West Haven. The State produced witnesses who testified that upon entering the bank, and after stopping at a counter, Singer and Reddick approached two teller windows that were closed. Singer handed a note to William Murray, a bank employee who was present in the bank to service its computers, but Murray informed them that he was not a teller. Singer and Reddick then approached the teller window of Sheila Carlquist, behind whom was standing Brunilda Lopez. While Ms. Carlquist did not testify at the trial because she had relocated to Florida, Ms. Lopez testified that she observed Singer and Reddick whispering to Ms. Carlquist. She was able to give physical descriptions of both men to the police. The CT Page 5123-MMMM State produced further evidence that once Ms. Carlquist turned money over to Singer and Reddick, including a dye pack, the robbers left the bank. Shortly thereafter, Singer was apprehended and returned to the bank where he was identified as one of the robbers. Additionally, the State produced evidence that Singer gave a statement implicating Reddick as his cohort. Reddick was apprehended by the police on February 7, 1991.
The petitioner presented alibi evidence that on the date of the robbery, he had visited the Martin Luther King Elementary School in conjunction with the poor attendance of his nephew, Leroy Reddick. He also produced testimony that later in the afternoon, as it was becoming dark, he went to the apartment of Domingo Torres who was making a birthday cake for Reddick's mother and the two men then visited Reddick's mother at her Hamden apartment between the hours of six p. m. and eight p. m.
The record of counsel's cross examination of the State's witnesses as well as the presentation of defense witnesses does not support the petitioner's claim that trial counsel was inadequately prepared for trial. A review of counsel's examinations and cross examinations does not reveal that they were inadequate, or the product of poor preparation.
In regard to the petitioner's claim that counsel failed to lessen the suggestiveness and defend against an in-court identification, the court finds that following jury selection, and out of the presence of the jury, the court conducted an evidentiary hearing in response to a Motion to Suppress Identification filed on behalf of the petitioner. This motion addressed both the out-of-court identification as well as any subsequent in-court identification. At this hearing, Ms. Lopez was called to testify concerning her out-of-court identification of the petitioner. Prior to her testimony, counsel for the petitioner moved, pursuant to Practice Book § 970, that the petitioner be permitted to be excused from court room attendance. (T. 417) Counsel, on the basis that the petitioner would be the only Afro-American present in the court room during the testimony of Ms. Lopez, argued that his presence would be unnecessarily suggestive. On the basis that this was an evidentiary motion, the court denied counsel's motion. Id. During Ms. Lopez's testimony, she stated her observations of Reddick and Singer during their presence in the bank. She gave physical descriptions of each man, noting that one was taller, perhaps 5'8" to 6' tall, and the other was shorter, perhaps 5'4". (T. 427) She indicated that she CT Page 5123-NNNN had a good opportunity to see the shorter man (T. 435), and that he was no more than two to three feet away from her. (T. 436) She testified that shortly after the robbery, when one of the robbers, the taller one, was brought back to the bank by the police, she was able to identify him. Additionally, she stated that on the day after the robbery, the police showed her twelve photographs of black males from which she selected Reddick as the other, shorter, robber. (T. 437) At the time she selected the petitioner, she signed his photograph. (T. 440) Following her testimony concerning her out-of-court identification of the petitioner, she also made a positive in-court identification of the petitioner. (T. 443)
West Haven Police Officer James Tucker also testified at the suppression hearing. He indicated that he showed Ms. Lopez a photo board containing twelve photographs from which she selected the petitioner as one of the robbers. (T. 465) Based on the testimony of Ms. Lopez and Officer Tucker, the court denied the petitioner's Motion to Suppress.
Following the court's ruling on the Motion to Suppress, the jury was sworn and both Ms. Lopez and Officer Tucker testified before the jury, repeating, in essence, their earlier testimony given during at the suppression hearing. Ms. Lopez testified to her clear view of the petitioner in the bank during the robbery (T. 481) and to her positive out-of-court identification of the petitioner from a photographic line up on the day after the robbery (T. 505). Additionally, she made a positive in-court identification of the petitioner. (T. 507) Officer Tucker testified that the positive identification of the petitioner made by Ms. Lopez from the photographic array was immediate, spontaneous, and quick. (T. 546)
The petitioner's claim that Attorney Aspinwall should have lessened the suggestiveness and defended against an in court identification is unsupported by the transcripts of either the hearing on his Motion to Suppress or the trial evidence. With respect to the out-of-court identification of Reddick by Ms. Lopez, his presence or absence from the court during the testimony of Ms. Lopez and officer Tucker was not a factor. Additionally, at the habeas hearing, the petitioner presented no substantiation that the in-court identification was suggestive other than the fact that he was the only Afro-American in the court room when the identification was made. As noted by the Supreme Court, the court's ruling on the out-of-court CT Page 5123-OOOO identification of the petitioner made any claim regarding the in-court identification moot. cf. State v. Reddick, supra, 224 Conn. 469. Other than the petitioner's bare assertion that counsel failed to properly lessen the suggestiveness and defend against the in-court identification, the petitioner has presented no evidence that any other in-court procedure would have decreased the certainty of the in-court identification of the petitioner.
At the outset, the court notes that the petitioner had no right not to be present in court during the identification testimony. cf. State v. Reddick, supra, 224 Conn. 464. While one may offer conjecture that having other Afro-American males present in the court room, or having the petitioner sit away from counsel table, might have caused some doubt in the minds of the identifying witnesses, such speculation is not a proper function of the habeas court. Given the clear view of the petitioner afforded Ms. Lopez during the robbery, together with her positive identification of the petitioner from an untainted photographic line up, there is no basis for the court to conclude that Ms. Lopez would have been confused or unable to make an in-court identification of the petitioner if he had not been seated at counsel table or if other Afro-American males had been in the court room
Contrary to the petitioner's assertion, Ms. Lopez was not the only witness to identify the petitioner. The State called William Murray who testified that on January 24, 1990, he was an employee of the Bank of Boston, present in the West Haven branch to service teller line computers. (T. 600) He stated that he noted two black males, one taller than the other, one of whom tried to pass a piece of paper to him (T. 604) and that when he told the man that he was not a teller, they walked away. (T. 605). He indicated that the shorter man was about three feet from him, face to face with him. (T. 610) He stated that when Singer was brought back to the bank shortly after the robbery, he was able to identify him. (T. 607) He also indicated that he was never shown a photograph of the petitioner. (T. 608). When asked if he saw the shorter robber in the court room, he stated that he believed so and indicated the petitioner (T. 608), and when asked as to his level of certainty he said he was positive. (T. 609)
Our courts have repeatedly held that a defendant's protection against the obvious suggestiveness of any courtroom identification confrontation is the defendant's right to cross-examination. cf. Manson v. Brathwaite, 432 U.S. 98, 113
CT Page 5123-PPPP n. 14 (1977).
A review of the transcript of the criminal trial reveals that counsel conducted a thorough cross examination of the State's identification witnesses.
In addition to these witnesses who did identify the petitioner, there were witnesses who were unable to make an identification. Selena Weeks, another bank teller, testified that she was not able to make a photographic identification of the robbers on January 25, 1990. (T. 630). Gloria McCauley, a bank customer services representative, testified that she was not ever able to make an identification of the petitioner. While it may have been insightful trial strategy for the State to call these two witnesses as State's witnesses so as to lessen the impact of their exculpatory testimony, the trial transcript discloses no lack of artfulness or skill in defense counsel's treatment of either of them.
The State's case was not based entirely on identification evidence. The State called West Haven Police Detective Burton Clifford who testified that he arrested Singer at approximately 2 p. m. at 42 Shelton Avenue in New Haven on the day of the robbery and shortly thereafter brought Singer back to the bank. He stated that he interviewed Singer, and that although Singer could not give him the name of his cohort, he took him to his cohort's mother's house in Hamden. (T. 598) Detective Clifford further testified that this was the home of Maxine Reddick. (T. 583) Detective Clifford stated that, once at Ms. Reddick's house, Singer recalled that his cohort's last name began with an "R", and then he picked the name "Reddick" from the telephone book. (T. 598) Finally, Detective Clifford stated that he learned that the petitioner, Singer, and the petitioner's girl friend had all lived together at the Shelton Avenue address. (T. 586)
There was also evidence of flight. Officer Tucker testified that he found the petitioner at the Shelton Avenue address and that the petitioner leapt from a third floor window to the roof of another house while the police were in pursuit. (T. 550) FBI Agent Bufford Boone, who joined in the apprehension of the petitioner, testified that he chased the petitioner who attempted to climb a fence while being pursued. (T. 655)
The petitioner additionally claims that counsel failed to properly bring forth testimony and object to the exculpatory CT Page 5123-QQQQ (sic) evidence of finger prints, hair samples and dye. A review of the trial transcript belies this claim. With respect to the dye, there was trial testimony that bank tellers keep dye packets which are disguised to give the appearance of money packets, and these are kept in the same place as actual money. There was further evidence that the robbers took a dye packet as well as money from the bank, and that shortly after they exited the bank the dye packet went off. Attorney Aspinwall elicited testimony, during his cross examination of Ms. Lopez, that when a dye packet explodes, it sticks. (T. 453) Attorney Aspinwall also elicited testimony from defense alibi witnesses Margaret Thomas that the petitioner did not appear to have any red dye on his person when she saw him on January 25, 1990 (T. 28, Feb. 27, 1991), from Domingo Torres that the petitioner did not have any stains on his person in the early evening hours of January 24, 1990 (T. 51, Feb. 27, 1991), and from his mother, Maxine Reddick, that he had no red dye on his person when she saw him on the evening of January 24, 1990. (T. 68, Feb. 27, 1991) Finally, West Haven Detective John Brunetti acknowledged that at the time the petitioner was apprehended on February 7, 1990, there was no evidence of red dye on his person. (T. 696) Contrary to the petitioner's assertions, the court finds that Attorney Aspinwall's examinations and cross examinations concerning the dye packet was appropriately intended to demonstrate both that the dye exploded and would naturally stick to one in close proximity to the explosion, but also that none of the witnesses who claimed to have seen the petitioner around the time of the robbery observed any red dye on his person.
At the habeas hearing, the petitioner also claimed that counsel should have presented scientific testimony concerning the durability of bank dye. The petitioner, however, failed to demonstrate what such purported evidence would have shown, or in what way he was prejudiced by the absence of such evidence.
Similarly, Attorney Aspinwall made the most he could of the absence of fingerprint and hair evidence relating to the petitioner. Detective Brunetti testified that while the police were able to find Singer's fingerprints at the bank, they were unable to find any fingerprints of the petitioner. And, while the robbers utilized a withdrawal slip with the name "Reddick" on it, the police were not able to identify the finger prints they found on the slip. (T. 670).
Less helpful to the petitioner was police testimony that, CT Page 5123-RRRR while they were unable to discern the petitioner's fingerprints at the bank, they did lift some prints which could not be identified because they did not contain enough points of identification (T. 664), or that the unidentified prints found at the teller's window would not have been consistent with the petitioner's if he had been standing next to Singer (T. 667), and that the prints on the bogus withdrawal slip were not identifiable. (T. 670) It may also not have been helpful in regard to the fingerprint evidence that the police found a pair of black gloves in an automobile not far from the bank together with clothing and money. (T. 682-692) The court concludes that Attorney Aspinwall appropriately utilized the fact that no fingerprints of the petitioner were found in the course of the police investigation. It was not within his power to block the police testimony tending to reduce the benefit to the defendant of this exculpatory information. The court believes that counsel appropriately sought to reap the benefit available from the fingerprint testimony. At the habeas hearing, the petitioner offered no evidence that further testing or other forensic processes, if made available to the petitioner at the time of trial, would have altered this testimony.
With respect to hair samples, Detective Brunetti testified that the police processed a Red Toyota motor vehicle which was found nearby the bank and in which the police found red dye, clothes and money. Detective Brunetti testified that samples of hair taken from a cap located in the car were inconsistent with the petitioner's hair. (T. 705) This evidence could only be viewed as favorable to the petitioner.
The court finds that counsel's examination of the witnesses concerning fingerprints, dye, and hair samples was appropriate.
The petitioner claims also that counsel failed to conduct, prepare or utilize a pretrial investigation. During the course of the habeas hearing, the court heard evidence that an investigative report had been prepared on behalf of the petitioner while awaiting trial, and the report itself was marked as an exhibit. cf. Respondent's Exhibit A. At the outset, the court finds no discontinuity in the flow of representation from Attorney Halpern to Attorney Aspinwall. While at the habeas hearing Attorney Halpern was not able to recall the specifics of his cooperation with successor counsel, and the court notes that the switch was made during jury selection, the court is satisfied both from Attorney Aspinwall's comments to the court as well as CT Page 5123-SSSS from a review of his trial conduct that he had the benefit of the contents of the pretrial investigation and he utilized its contents appropriately. Attorney Aspinwall first appears in the transcript on February 14, 1991, during jury selection, when he reported to the court that he was ready to go (T. 267) and that he was prepared. (T. 273) On the same date, the court ordered Attorney Halpern to cooperate with successor counsel (T. 274) On the following Tuesday, on resuming jury selection, Attorney Aspinwall reported to the court that he had spent the previous weekend going over the file, that he had met with Attorney Halpern over the weekend, that he had asked Attorney Halpern for a narrative and that he had done it. (T. 281-284)
At the trial, Attorney Aspinwall called numerous alibi witnesses. He also called Edward Singer, who admitted that he robbed the bank but pointed the finger to another man as his accomplish.
Charlene Harris, a secretary at the Martin Luther King School in New Haven, testified that a person claiming to be the uncle of a student, Leroy Reddick, arrived at school in the morning of January 24, 1990 concerned about Leroy's school attendance. While she was not able to positively identify the petitioner as the person, it was later established by the young man's teacher, Margaret Thomas, that the petitioner is, in fact, Leroy Reddick's uncle and that the petitioner had demonstrated a genuine concern about Leroy's school attendance over a substantial period of time. Ms. Thomas testified that the petitioner was at the school on January 25, 1990, and that she did not notice any red dye on his person at the time. Additionally, counsel called the petitioner's sister, Denise Reddick, who testified that the petitioner was at her home on Plymouth Street in New Haven at approximately 1:15 p. m. on January 24, 1990, and that they discussed the fact that it was their mother's birthday. In corroboration of Ms. Reddick's testimony concerning her mother's birthday, counsel called Domingo Torres who testified that he saw the petitioner in the early evening hours of January 24, 1990 while he was making a birthday cake for the petitioner's mother, and that he and the petitioner then visited the elder Ms. Reddick in Hamden where they helped celebrate her birthday. (T. 51, February 27, 1991) It is the court's impression that these alibi witnesses were presented not only in an effort to prove that the petitioner was at his sister's residence around the time of the robbery, but to show, from his activities during the day, that his frame of mind, appearance, and demeanor were inconsistent CT Page 5123-TTTT with one who was either contemplating or who had just completed a bank robbery. That the jury did not credit this testimony is no condemnation of the effort. It was the day's events, and not counsel's pen, that authored the script available to him.
Also, in regard to the petitioner's claim that counsel did not have adequate pre-trial preparation, the court notes that counsel called Edward Singer to testify. Singer claimed that he has initially named the petitioner as his accomplish because he was trying to protect one Mark Jackson, who he testified was in fact his cohort in the bank robbery. He claimed that he initially implicated the petitioner as his partner because Jackson had promised to give some money to his girlfriend (T. 87, February 27, 1991) and that in naming Reddick he had lied to the police. (T. 117, February 27, 1991) He also denied that he had taken the police to the home of Maxine Reddick in Hamden on the evening of the robbery. (T. 102, February 27, 1991) While the jury may have found Singer to be less than credible, under the circumstances of this case, it was not ineffective for counsel to have called him. Nor does the record suggest that counsel had not conferred with Singer prior to calling him to testify. In the situation in which counsel was aware that Singer, who had already confessed to the crime, would testify that his client was not involved in the robbery, counsel most certainly would have been criticized for failing to present this exculpatory evidence. It is through no failure of diligence or performance of counsel that Singer did not carry the day.
Finally, the petitioner claims that counsel improperly advised him to inter a plea of nolo contendere to the charge of being a persistent dangerous felony offender. Following his conviction by the jury of Robbery in the Second Degree, the petitioner did enter a plea of nolo contendere to being a persistent dangerous felon in violation of C.G.S. §53a-40(a)(1)(2)(A). Pursuant to this statutory citation, one is a persistent dangerous felony offender who stands convicted of ". . . robbery in the second degree", and ". . . (2) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death . . . for any of the following crimes: (A) The crimes enumerated in subdivision (1) of this subsection. . ." At the habeas hearing, the petitioner pointed to no infirmity in the court's canvass of his plea, nor to any facts which would otherwise erode confidence in the court's judgment accepting his nolo contendere plea. Nor did the petitioner offer CT Page 5123-UUUU any evidence that the outcome would have been different if he had contested the State's claim that he was a persistent dangerous felony offender.
For the reasons stated, the petition is dismissed.
Bishop, J.