[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this habeas petition, the petitioner asserts that his confinement in the custody of the respondent is illegal on the basis of his claim that his underlying criminal conviction is invalid. Through an amended petition dated December 4, 1996, the petitioner has framed four claims: (1) he was denied the effective assistance of counsel in the underlying criminal proceedings; (2) the court's canvass during his guilty plea was inadequate, and that his guilty plea was not knowing, intelligent and voluntary; (3) the State failed to disclose exculpatory information to the petitioner in a timely fashion; (4) neither the court nor the clerk informed the petitioner of his right to appeal the judgment of conviction.
Based on the evidence adduced at trial, the court makes the following findings and order.
FACTUAL BACKGROUND
On July 14, 1989, in Docket Number 54065 in the Superior Court, Hartford Judicial District at Hartford, the petitioner was convicted by his own plea of the criminal offense of Murder in violation of Connecticut General Statute 53a-54a. Subsequently, on August 31, 1989, the petitioner was sentenced to serve a period of forty years incarceration. The petitioner is an inmate confined in the custody of the respondent Commissioner serving the imposed sentence.
In the underlying criminal prosecution, the petitioner was represented by (former) Attorney Michael A. Peck.[1] While the CT Page 1802 State was initially represented by Assistant State's Attorney Lawrence Daly, following Attorney Daly's untimely death on December 17, 1988, the file was taken over for the State by Assistant State's Attorney Warren Maxwell.
While the facts upon which the petitioner entered his guilty plea are set forth in detail in the plea transcript, a brief review of the asserted facts is appropriate for the court's discussion. In order to establish a factual basis to the petitioner's plea, Attorney Maxwell informed the court as follows:
 Yes, sir. This incident happened in the nineteenth of March, 1988. The defendant and the victim had been engaged in illegal business activities, and a dispute erupted over the — a debt of four hundred dollars, which the victim claimed Mr. Daniels owed him. And I guess that dispute and the claim was pressed on many occasions, to the point where Mr. Daniels decided to take matters into his own hands. What happened was there was a prearranged meeting between Mr. Daniel and the victim to meet on Lyme Street in Hartford. The victim arrived there in a white Nissan, in the car with him was one of the State's witnesses. And the car was parked. Earlier that day Mr. Daniel had called another State's witness by the name of Mark Osborne. Now, Mr. Osborne was the owner — and I believe legitimate owner — of a shotgun. It was not — I don't believe it was an illegal, cut down weapon, I believe it was a modified version of a regular shotgun, in that it was shorter and had a pistol grip type handle. Mr. Osborne called — I'm sorry, Mr. Daniel called Mr. Osborne, told him he wanted to borrow his rifle. Osborne inquired why he wanted it, Daniel responded that he wanted to — he was going to meet with the victim and he wanted to scare him. There was no indication it was going to be used other than to scare the victim. Osborne consented to its use for that purpose. Daniel went to Tower Avenue, where Osborne lived, and was greeted by Osborne, who had the shotgun in a box in the first floor of that apartment. And some twelve gauge shotgun shells. And he delivered possession of that weapon and the — some shells to Mr. Daniel, who promptly put in CT Page 1803 into the pantleg of a sweatsuit he was wearing. He invited Osborne to join him and Osborne said he would. The two of them proceeded to walk west of Tower Avenue towards Lyme Street. As they were walking on Lyme Street, an RX-7 Mazda pulled up — stolen. Another man by the name of Stark was driving that car. Both of these parties got into the Mazda and proceeded to drive, at this point, to Lyme Street. When they got there they saw the white Nissan parked and they knew the victim was in it. Both Osborne and this defendant, Mr. Daniel, exited the Mazda and proceeded to walk toward the white Nissan. The RX-7, with Stark driving it, left. At this point the passenger in the victim's car got out of the white Nissan, went around to the passenger side, off to the side of it. The other two continued to approach the car. At this point Daniel went to the car window. Both witnesses — all three witnesses — I'm sorry, the two witnesses then saw Mr. Daniel unzip his jacket, remove the shotgun from the pantleg, point it into — the window, made some threatening comment and said he had five seconds and proceeded to count a down count — five, four, three, two, and then fired point blank at close range with that shotgun, striking the victim in the face. He racked the shotgun, fired a second time, striking the trachea, racked the shotgun, fired a third time, striking the left shoulder area. The body was torn apart. The witnesses were shocked, they never thought this was going to happen. Right after the shooting occurred, the Mazda returned. Now all three of them get into the Mazda and they leave the scene. There are other matters which are not necessarily relevant to this proceeding, but that is the factual basis for the Murder charge.
Petitioner's Exhibit 4, Court Transcript, July 14, 1989, pp. 3-5.
Following Attorney Maxwell's recitation, the court inquired:
 The State's witnesses were — the State had the ability to produce and was going to produce the three witnesses that were at the scene of the murder? Id. pp. 5-6. CT Page 1804
To this inquiry, Attorney Maxwell responded:
 Not Mr. Stark. Mr. Stark is a defendant for hindering prosecution. Mr. Osborne, who owned the shotgun, prior to the hearing of probable cause was granted immunity under the statute. He was going to testify. He did testify at the probable cause hearing. And the passenger, whose name escapes me at the moment, who was with the victim in the white Nissan, who got out and observed this whole thing, was not arrested and he was going to testify for the State as well.
Following a colloquy between the Court and Attorney Maxwell concerning the nature of the dispute between the victim and Daniel, the court turned to the petitioner. The following exchange took place:
 THE COURT: Thank you, Mr. Maxwell., Mr. Daniel, the facts indicated by the State on the record — you've plead guilty to Murder before this court, based upon the recitation of Mr. Maxwell of the facts, do you dispute any of the facts as indicated by the State on the record?
THE DEFENDANT: What I just heard?
THE COURT: Yes.
THE DEFENDANT: Yes, I do.
THE COURT: Which facts do you dispute, sir?
THE DEFENDANT: That's not what happened.
 THE COURT: Now, you're being charged with Murder, you've just plead guilty to Murder. And the gravamen obviously is the moment when, according to the State, you shot the victim here on three — three different occasions. Are those facts accurate?
THE DEFENDANT: Yes. CT Page 1805
 THE COURT: So you did have the shotgun in your hand, the facts as far as the State has alleged on the record of shooting the victim here, cracking the gun after the first time two other times — you shot him three times?
THE DEFENDANT: Yes.
 THE COURT: Alright. Now, as far as the factual basis which you dispute, tell me about that.
 THE DEFENDANT: As far as what happened between me and Mark, and Robert, the witness who was in the white Stanza, that's not true.
 THE COURT: Explain further, what do you mean it's not true? Why isn't it true?
 THE DEFENDANT: As far as — I mean, what happened, or is it just —
THE COURT: Tell me. Sure.
 THE DEFENDANT: The call that Robert Gordon got, he didn't get a call from me telling him to meet me on Lyme Street. As far as Mark Osborne telling me about the gun and I'm inviting him along, I didn't invite Mark anywhere.
THE COURT: He just came along?
THE DEFENDANT: Just came.
 THE COURT: Is there anything else you dispute about the facts?
THE DEFENDANT: No. Id. pp. 7-8.
Following additional colloquy involving the court, the petitioner, Attorneys Maxwell and Peck, the court accepted the petitioner's plea and entered a finding of guilt. Thereafter, on August 31, 1989 the petitioner was sentenced in accordance with the agreed recommendation to a term of forty years to serve.
THE CANVASS WAS COMPLETE
CT Page 1806
The petitioner's claim that his plea was not entered knowingly and voluntarily is without merit. The court's canvass was adequate. The facts recited by Attorney Maxwell were sufficient to warrant the guilty finding. The facts disputed by Daniel during the canvass were on matters not essential to a finding by the court that there was an adequate factual basis to find the petitioner guilty of Murder. His challenge to these peripheral facts did not require any further canvass by the court.
The petitioner's claim that the court's canvass was deficient because it did not include a specific discussion with the defendant of the element of intent is unavailing. During the canvass, the court read the statutory definition of Murder to the defendant, which included the element of intent. Given this recitation, together with the State's statement of the underlying facts which led up to the actual shooting, it was unnecessary for the court to question Daniel explicitly as to whether he did, in fact, intend to kill the victim. Additionally, the petitioner, having heard the State's recitation as well as the Court's reading of the essential elements of Murder, did not, at any time, indicate a lack of intent on his part. To the contrary, he only challenged matters immaterial to a finding of guilt. That Daniel admitted his intention to kill the victim could reasonably be inferred by the court at plea from Daniel's acknowledgment of the accuracy of the State's recitation of the essential acts leading up to and including the shooting.
The petitioner asserts also that once he disputed some of the facts as recited by the State, the court was obligated to conduct a further inquiry. This the court did. The factual assertions made by Daniel which were inconsistent with the State's recitation of facts did not contradict his admission of guilt of the crime of Murder. They did not present a conflict between Daniel and the State requiring any more inquiry than was made by the court. Cf. North Carolina v. Alford, 400 U.S. 25, 32 (1970).
Also, the petitioner did not, at any time subsequent to the entry of his guilty plea, attempt to withdraw his plea. The court will not entertain, in this collateral attack, matters which the petitioner could have raised directly in the underlying criminal process. cf. Practice Book 719, 721. Other than through his claim of ineffective assistance of counsel, the petitioner has appraised this court of no reason for his failure to seek to CT Page 1807 withdraw his guilty plea. In the absence of such a showing, the petitioner is procedurally barred from raising, through this collateral process, an issue which he could have raised in the criminal proceedings. cf. Wainwright v. Sykes, 433 U.S. 72
(1977); Johnson v. Commissioner, 218 Conn. 403 (1991).
THE RIGHT TO APPEAL
The petitioner's claim that he was wrongfully denied the right to appeal his conviction because he was not informed by the court or clerk of his right to appeal the judgment is unavailing.
The petitioner's plea was unconditionally made without any references to reservation of any issues. Our Supreme Court has noted:
 It is well established that, `an unconditional plea of guilty or nolo contendere, intelligently and voluntarily made, operates as a waiver of all nonjurisdictional defects and bars the later assertion of constitutional challenges to pretrial proceedings. . . . Therefore, only those issues fully disclosed in the record which relate either to the exercise of jurisdiction by the court or to the voluntary and intelligent nature of the plea are ordinarily appealable. . . .' (Emphasis and citations omitted). State v. Madera, 198 Conn. 92, 97-98. State v. Kelley, 206 Conn. 323 (1988).
The petitioner's guilty plea was unconditional. It constituted a waiver of any non subject matter jurisdictional defects in the pretrial proceedings. The petitioner had no right to appeal from the court's finding of guilt and its subsequent judgment.
THE CLAIM OF EXCULPATORY INFORMATION
The petitioner claims that he was denied a fair trial by the late disclosure of exculpatory evidence. In support of this assertion, the petitioner has demonstrated that during the time period of the petitioner's pretrial proceedings, it was the State's Attorney's policy in Hartford that the State's files were not open to inspection by defense counsel until after a Probable Cause Hearing and the first pretrial had been conducted. It is clear that the State had a duty to disclose exculpatory material, CT Page 1808 notwithstanding it is limited closed-file policy in effect at the time, at the preliminary stages of criminal proceedings. Thus, a policy to keep its file closed to defense counsel until after the Probable Cause Hearing and the conduct of the first pretrial would have been constitutional only if, as an exception to that policy, the State had provided defense counsel exculpatory information in a timely manner. Cf. State v. Mitchell,200 Conn. 323 (1986). The petitioner claims that the State was in possession of numerous undisclosed exculpatory information and documents prior to the probable cause hearing. The short answer to this claim is that this defect, while arguably of constitutional dimension, was waived by the petitioner's subsequent guilty plea. As noted, a guilty plea constitutes a waiver of all non-jurisdictional pretrial defects, including those of constitutional dimension. State v. Kelley, supra; 206 Conn. 327 (1988). Thus, even if the petitioner could establish that the State, by failing to disclose certain information in its file prior to the Probable Cause Hearing, had violated the petitioner's constitutional right to access to exculpatory materials at a time when they could be effectively used by him, he waived this claim by his subsequent guilty plea. In this regard, the court is mindful of the petitioner's acknowledgment that once he had waived the Probable Cause Hearing, the State's file became open to defense counsel. Thus, at the time of his plea, the petitioner was aware of the information in the possession of the State which had not been disclosed to him prior to the date on which he waived the Probable Cause hearing. Therefore, the State's failure to disclose this information earlier, if violative of the petitioner's rights, can not be said to have been material to his decision to plead guilty several months after the State's file had become open.[2]
Notwithstanding the question of waiver, the court has reviewed the evidence adduced by the petitioner in support of his claim that the State withheld exculpatory information up to the date of the Probable Cause hearing or the date of the first pretrial. In reviewing this information the court has applied the materiality test as set forth in United States v. Bagley,473 U.S. 667 (1985). The petitioner asserts that the State was in possession of numerous items of information that were exculpatory to him. These include forensic reports, photographs, criminal histories of State's witnesses, inconsistencies among witnesses' statements, and statements from witnesses favorable to the defense. The court has carefully reviewed each of these claims in light of the materiality criteria set forth in United States v.
CT Page 1809Bagley, 473 U.S. 667 (1985), and concludes that it can not reasonably be said that there is a reasonable probability that timely disclosure of this information would have resulted in a different outcome to the criminal proceedings. As correctly noted by the State, in brief, perhaps the information most favorable to the defense in the State's possession was a statement from witness Wright whose description of the physical events and individuals he claimed to see was both helpful to the defense and inconsistent with other witnesses' statements. Given Wright's limited opportunity to see, his distance from the shooting, and the police conclusion that he had been drinking alcohol during the evening of the shooting, his statements to the police, although facially beneficial to the petitioner, can not be said to have been material to the defense. The petitioner has failed to establish his burden of proof that his decision to plead guilty resulted from the State's failure to provide timely disclosure of exculpatory information.[3]
INEFFECTIVE ASSISTANCE OF COUNSEL
This claim appears to be at the heart of the habeas petition.
The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the Federal constitution and by Article First, Section 8 of the Connecticut constitution. In order to prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352 (1989). Competent representation is not to be equated with perfection. "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." Jeffrey v.Commissioner, 36 Conn. App. 216 (1994) (citations omitted). "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotations marks omitted.) Johnson v. Commissioner,36 Conn. App. 695 (1995).
The Strickland court also gave guidance to the trial bench for its assessment of ineffective claims. The Supreme Court opined:
Judicial scrutiny of counsel's performance must be CT Page 1810 highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy'. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted.) Strickland v. Washington, supra, 466 U.S. 689-90; Ouintana v. Warden, 220 Conn. 1 (1991); Williams v. Warden, 217 Conn. 419 (1991); Jeffrey v. Commissioner, 36 Conn. App. 216 (1994).
With respect to the "prejudice" component of the Strickland
test, the petitioner must demonstrate that, ". . . counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v.Washington, supra 466 U.S. 687. Thus, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." Id., 693. Rather, a successful petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner, 234 Conn. 139 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome."Strickland v. Washington, supra 466 U.S. 694. "`When a [petitioner] challenges a conviction, the question is whether CT Page 1811 there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"Fair v. Warden, 211 Conn. 398, 408 (1989); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
The Strickland standard pertains, as well, to cases involving guilty pleas. In a situation in which the petitioner entered a guilty plea, in order to satisfy the "prejudice" prong ofStrickland, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52 (1985). The Lockhart court further opined:
 In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. See e.g., Evans v. Meyer, 742 F.2d 371, 375 (CA7 1984). ("It is inconceivable to us . . . that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received"). As we explained in Strickland v. Washington, supra, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the CT Page 1812 "idiosyncrasies of the particular decisionmaker." Hill v. Lockhart, supra, 474 U.S. 59 (1985).
In applying the holding of Hill to a situation in which the petitioner had pleaded guilty to Murder, the Connecticut Supreme Court, in Copas v. Commissioner, appears to have explored two facets to the "prejudice" prong — an assessment of whether examination of the objective facts demonstrated a reasonable likelihood of a different result at trial, and whether it is reasonable to conclude that the petitioner, aware of these facts, would likely have opted to go to trial rather than to plead guilty. The Copas court, in its examination of the objective facts determined that:
 It is reasonable to assume that, had the information regarding the petitioner's mental illness been revealed through a proper investigation, it would have been presented to the state's attorney during plea negotiations and would have weighed in defense counsel's recommendation regarding how the petitioner should plead. 234 Conn. 139, 161 (1995).
The Copas court concluded, upon its review of the habeas evidence, that the petitioner had established a reasonable likelihood of a different outcome at trial based upon an objective evaluation of the evidence. With respect to whether it was likely that the petitioner would have, in fact, elected to go to trial, the court stated:
 Finally, in the absence of any assurance or indication by the trial court of what sentence it considered appropriate, in light of the state's expressed decision to recommend the maximum sentence even were the petitioner to plead guilty, and in light of the substantially different penalties involved, it is clear that the petitioner had little incentive to plead guilty to murder. Id.
at 166.
Thus, the court concluded:
 . . . the habeas court reasonably could have found that, because of this reasonable likelihood of a different outcome at trial and because of the fact CT Page 1813 that the petitioner had nothing to lose by proceeding to trial, it is reasonably probable that, but for the ineffective assistance of counsel, the petitioner would have elected not to plead guilty and instead to go to trial. Id. at 167.
In this case, the petitioner alleges myriad acts and omissions on the part of trial counsel which, he argues, constitute the ineffective assistance of counsel. He claims that counsel failed reasonably to investigate the circumstances of the shooting, to interview witnesses, to examine physical and documentary evidence, to advise the petitioner, to negotiate on behalf of the petitioner, to explore the viability of defenses and mitigating factors before recommending to the petitioner that he plead guilty, and to ensure that his guilty plea was knowing and voluntary. Indeed, the court finds that other than his interview of the petitioner and the petitioner's mother, and his examination of the State's Attorney's file, defense counsel conducted no investigation. While he may have talked with a co-defendant's counsel, he spoke with no witnesses. He did not speak with the medical examiner or with any forensic expert relating to the gun shot wounds or other physical aspects of the shooting. He did not explore the character and proclivities for violence of the victim, and he did not pursue the question of whether the petitioner was drug-dependent at the time of the offense. Once the petitioner acknowledged to him that he was the shooter, counsel's advocacy consisted of periodic reviews of the State's Attorney's file, participation at pretrials, and meetings with the petitioner to update him on the negotiations. This superficial representation, given the seriousness of the charges, was below a reasonable standard of competence and vigor. InStrickland terms, the court finds that counsel's representation was inadequate.
The issue turns, however, not on the question of effectiveness but on the issue of prejudice. While habeas counsel has diligently presented evidence to suggest areas of reasonable doubt, including forensic evidence concerning the victim's gunshot wounds, opinion evidence regarding the trajectory and distance from which the mortal shots were fired, inconsistent statements from witnesses, and information concerning the victim's propensity for violence, the court is unpersuaded that there is a reasonable likelihood that the cumulative effect of this evidence would have resulted in a different verdict, had the CT Page 1814 petitioner chosen to go to trial. It is not the court's function to speculate whether the proffer, at trial, of the evidence adduced at the habeas trial might have affected the factual decision makers, but rather, whether there is a sufficient probability of a different outcome so as to undermine the court's confidence in the judgment of guilt. Given the operative physical facts of this shooting, combined with the availability of witness testimony consistent with the State's theory of the case, the court is unpersuaded that there is a reasonable probability that a trial would have resulted in a more beneficial outcome to the petitioner. Counsel's failures do not undermine the court's confidence in the court's judgment of guilt.
Additionally, the court is unpersuaded that the petitioner would have elected to try his case, even if he had been given the benefit of all the information adduced at the habeas hearing prior to entering his guilty plea. Unlike Copas, in which the court inferred a likelihood that the petitioner would have tried his case because he had nothing to lose faced with the State's desire to recommend the maximum sentence, Daniel benefitted [benefited] substantially from his plea bargain by achieving an agreed-sentence of forty years-effectively twenty years less than the maximum.[4]
The petitioner, therefore, has failed to meet his burden of proving that, but for counsel's ineffective representation, he would have elected a trial, and that, in such trial, the outcome would have been more beneficial to him than the bargain he struck.
For the reasons stated, the petition is dismissed.
Bishop, J.