[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an amended petition for habeas corpus in which the Petitioner claims that he was deprived of effective assistance of counsel in violation of his rights under the Sixth Amendment to the United States Constitution. Certain facts are undisputed, which are, inter-alia:
The Petitioner was a defendant in a criminal case, CR 89-109233, J.D. of Hartford/New Britain at Hartford. On July 16, 1999, the Petitioner entered a plea of guilty under the Alford Doctrine to an information charging one count of murder in violation of CGS § 53a-54a (c) with a recommendation of forty years imprisonment with a right to argue for less. On September 27, 1990, the Petitioner was sentenced by the court,Norko, J. to a total effective sentence of thirty-eight years to serve. The Petitioner's defense counsel was Attorney Steven Moran, Assistant Public Defender.
 STANDARD OF REVIEW
"For the Petitioner to prevail on his claim of ineffective assistance of counsel, he must establish both that his counsel's performance was deficient and that there is a reasonable probability that, but for counsel's mistakes, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984); Johnsonv. Commissioner of Corrections, 58 Conn. App. 482, 484 (June 27, 2000). Under Hill v. Lockhardt, 474 U.S. 52, 59 (1985) the United States Supreme Court held that the same two part standard applies to claims arising from the plea negotiation process and that the same justifications for imposing the prejudice requirement in Strickland, supra, were relevant in the context of guilty pleas. The Petitioner must show that, but for CT Page 15941-ev counsel's errors, the Petitioner would have insisted on going to trial. Further, under Hill supra and under Copas v. Commissioner ofCorrections, 234 Conn. 139, 156-157 (1995) the resolution of the "prejudice" inquiry will depend largely on whether the Petitioner would have succeeded at trial if he had indeed pleaded not guilty. In Henry v.Commissioner of Corrections, 60 Conn. App. 313, 316-18 (2000) the court cited the standard in Strickland v. Washington supra. In specifically mentioning the second or prejudice prong of Strickland supra the court quoted Strickland as "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."
 FACTS OF THE OFFENSE
The facts of the offense are largely set forth in the confession of the Petitioner on January 29, 1989, Respondent's Exhibit B, and the pre-sentence investigation report done by the Office of Adult Probation which is Respondent's Exhibit F.
On January 28, 1989 the Petitioner who was under a protective order issued by the court to stay away from his wife, Maria Perez, visited her at her apartment at 123 Marimac Road in New Britain, Connecticut. The couple had been married since 1976 and had three children. At the apartment at approximately 4:30 p.m., the Petitioner stabbed his wife twenty-one times causing her death. He then left the scene and later turned himself in to the Hartford police. In his written confession to the New Britain police, Defendant's Exhibit B, he stated that Maria and he had been separated and had several problems with their marriage. Pertinent parts of his confession are as follows:
 "That on Wednesday, 01-25-89, I went over to my friends apartment at 12 Washington St. in New Britain, Connecticut. His name is Victor Almodavar. Victor and I spoke for a while about different things and then he told me that he was having an affair with my wife Maria.
 On this date, 01-28-89 at approx. 3:00 p.m. I went over to my wife's apartment at 123 Marimac Road just to see what she would say about her having this affair with Victor. Maria admitted to me that it was true that she and Victor have been seeing each other over this past year and that she admitted to having an CT Page 15941-ew affair with him.
 I also said to Victor during our conversation that I did not want him to see my wife any more as I will still trying to piece our marriage back together again.
 That after Maria confessed to me about having an affair with Victor, I told my children to go outside. That after the children left the apartment I grabbed a knife from a kitchen drawer and told Maria that I was going to kill her because she was playing with my sentiments. I have warned Maria in the recent past that if she played with my feelings that the action that I would take against her would be hard.
 As I was holding the knife in my hand, I began to stab Maria while we were in the kitchen. I felt that at this time I was blinded. I recall stabbing her in the stomach first and Maria stated "Jr. don't do this.' I then stabbed her a second time in the stomach and then spun her around and stabbed her once in the back. I don't know what had happened after this because I was blinded.
 I then recall dropping the knife in the kitchen and leaving the apartment through the rear door. . . .
 Victor Almodavar was a very good friend of mine for many years. I feel that it is Victors responsibility for what had happened to my wife because he caused the problems. This incident that happened to my wife was an abusive act but I don't feel that I have been abusive to her in the past. The reason that I committed this act was because I loved Maria a lot, and after hearing Maria and Victor both confess to me, the rage that I was in was because I was so hurt emotionally . . ."[1]
 ISSUES
In his Amended Petition, Petitioner cites the usual claims of ineffective assistance of counsel; "that counsel did not adequately advise him concerning his options as to whether or not to enter a guilty CT Page 15941-ex plea or proceed to trial, did not adequately advise him concerning sentencing, concerning his options, concerning various potential defenses, that counsel failed to ensure that the Petitioner's plea was knowing, intelligent and voluntary, defense counsel did not conduct sufficient investigation into the legal issues in the Petitioner's case, did not conduct sufficient investigation into the potential defenses to the prosecution's case, did not conduct sufficient investigation into the witnesses available to support potential defenses and did not adequately advise the Petitioner concerning the elements of the offenses to which his plea was entered." What all this boiled down to at the habeas trial conducted on October 30th and 31st 2001 before this Court is that the Petitioner claimed that at the time of the killing he was under the influence of alcohol and that he suffered from extreme emotional disturbance which, if proven at trial, as to extreme emotional disturbance would have resulted in a finding of guilty of manslaughter instead of murder resulting in a maximum sentence of twenty years imprisonment. A defense of being under the influence of alcohol at the time of the killing would have been a mitigating circumstance, he claimed, that would remove the element of intent to the crime of murder.
This is a somewhat unusual habeas corpus proceeding in that Attorney Moran, defense counsel at Petitioner's trial, is no longer associated with the Public Defender's Office, and no one knows his whereabouts. Additionally, the transcript of the plea canvas by Judge Norko was destroyed because of its age, the canvas having occurred on July 16, 1990. The Respondent has not used laches as a defense probably because of laches the Petitioner himself was hurt due to the lack of the transcript and the unavailability of Attorney Moran. However, it is the Petitioner who was responsible for laches. He claimed in the habeas trial that he didn't become aware of the possibility of a habeas petition until 1998 when he was transferred to his present place of incarceration, MacDougall Correctional Institution. Even then he waited two years to file his original petition. The delay was caused by the Petitioner and not by the Respondent.
This Court has based much of its decision upon the credibility of the witnesses. The Court's evaluation of their credibility is based upon their demeanor and attitude on the witness stand, the manner in which they responded to questions and the instances where their testimony conflicted with their own testimony and with other evidence, including exhibits, their recollection or lack of recollection of certain events and the interest of the witnesses or lack thereof in the outcome of the case. Suffice it to say that this Court found a lack of credibility in the testimony of the Petitioner in view of testimony of other witnesses, CT Page 15941-ey conflicts with his own testimony as well as the exhibits.[2] In sharp contrast the Court found that the witnesses presented by the Respondent were candid and credible.
The Court will now address the two possible defenses of the Petitioner.
1. Extreme Emotional Disturbance:
The problem with this defense is that there was no credible evidence to support it. Petitioner's confession alone would indicate that the crime was premeditated. His confession admits that he knew three days before he killed his wife that his wife and Victor Almodavar had been having an affair. Further, he confessed that he had warned Maria in the recent past that if she played with his feelings that the action that he would take against her would be hard. Also, according to the confession, after Maria confessed to him about having an affair with Victor, he told the children to go outside. His daughter, Wendy Perez, now age 23 but age 12 at the time of the murder, testified at the habeas trial, inter-alia, that outside the apartment at Marimac Road, the Petitioner told the children to "give her (Maria) a kiss and say goodbye to her" (Emphasis added). Goodbye means they would not see her again. In Petitioner's letter to the prosecutor which was also given to the psychiatrist, Dr. Grayson, Respondent's Exhibit D, the Petitioner stated inter alia: "I know that what I did was wrong, but what she was doing was wrong also. I always gave her everything she wanted and she repaid me by committing adultery . . . When I found out what she had done to me, it was a devastating blow to my pride and my manhood, especially since she didn't care." All of this indicates that he was planning to kill his wife when he went to her apartment on the day of the murder.
Additionally, Attorney Moran had the Petitioner submit to a psychological evaluation on September 30, 1989, long before the plea by the Petitioner, conducted by Dr. Julia M. Ramos Grenier, Ph.D., licensed psychologist who is an experienced psychologist who testified before this Court in another murder trial that the defendant in that case was under extreme emotional disturbance. It should be noted that in her report she claims that the Petitioner was functioning in an alcohol induced-blackout at the time that he killed his wife. It is noteworthy that nowhere in her report does she mention extreme emotional disturbance. This shows that Attorney Moran investigated the issue of extreme emotional disturbance and found it lacking.[3] He stated at the sentencing on September 27, 1990, Petitioner's Exhibit 1, "I would say that I believe there was — in my mind, there was a reasonable possibility — I am not going to say probability — but I would say a possibility that if this went to trial, it might have been reasonably possible that there CT Page 15941-ez would have been a conviction not on murder but on a lesser charge of Manslaughter in the First Degree because this is a situation that might very well have fit that. He would have had to have shown that he was exposed to an extremely unusual or overwhelming state; that he had an extreme emotional reaction to it. There is no doubt that that is I think true. And that as a result of that, that he lost self-control; that his reason became overcome by intense feelings, passion, anger, grief. That's the language of State v. Fair, the 1979 Connecticut Supreme Court case dealing with extreme emotional disturbance. As I say, I think there is a reasonable possibility — perhaps not a probability — but a reasonable possibility that this case would have fit under that, your Honor." It should be noted that Attorney Moran, on April 26, 1989 filed a "Notice of Intent to Rely on Defense of Mental Disease or Defect and to Introduce Expert Testimony". The State's Attorney also had a psychological evaluation done at the request of Inspector Martin Hart of the State's Attorney's Office. This was conducted by Donald R. Grayson, M.D., a psychiatrist, his report being dated December 18, 1989, Defendant's Exhibit E. Dr. Grayson never mentioned extreme emotional disturbance. He did say that the Petitioner "seemingly has had a chronic severe alcohol problem . . ." He then goes on to say that "If Mr. Perez' alcohol history is verifiable, then diagnostically he can best be classified as having alcohol amnesia disorder and alcohol dependence." He does state that he does not believe that Mr. Perez was psychotic and thus did have the capacity to appreciate the wrongfulness of his behavior and the capacity to conform his behavior to the expectations of the law. . . . If Mr. Perez' alcohol history is verified, then at the time of taking his wife's life, he was under the influence of alcohol and thus his judgment and impulse control were impaired." Nowhere does he mention extreme emotional disturbance.
This report by Dr. Grayson was available to Attorney Moran since the State's Attorney's Office in Hartford has had and does have an open file policy in which defense counsel can review all of the State's file. In sum, on this issue, Attorney Moran initiated a psychological evaluation for the Petitioner's benefit and became aware of a psychological evaluation done for the State by Dr. Grayson. Attorney Moran clearly concluded from these evaluations as well as from the confession that not only was there no evidence of extreme emotional disturbance but there was evidence of premeditation. Accordingly, he was wise not to pursue the defense of extreme emotional disturbance since it is highly likely that it would have been unavailing.
2. Alcohol Dependence:
CT Page 15941-fa
Petitioner's argument is that he was drunk at the time of the killing and, therefore, lacked the intent to commit murder. He believed that Attorney Moran should have used this as a mitigating circumstance and/or a showing of a lack of intent. State's Attorney Herbert Carlson, who tried the case for the State, stated in the sentencing transcript that he had a statement from a witness who said that the witness was with the Petitioner in the witness' car no more than an hour before the killing. Attorney Carlson stated as follows in the sentencing transcript, Petitioner's Exhibit 1: "And that he said that the defendant appeared to him as though he hadn't been drinking and in fact, he was going to a package store. He took the defendant with him. Asked the defendant if he wanted anything. And the defendant said, No, I'm not drinking these days.' And so that I bring that up for the court — if this court pleases, because there certainly was — and I think you're Honor may have canvassed it — a potential for intoxication as a defense to — or not defense but as something which could be used to determine whether or not the State could prove specific intent beyond a reasonable doubt. That's why I think I mentioned it previously." Both Dr. Ramos Grenier and Dr. Grayson state in their reports that the Petitioner was at the time an alcoholic, alcohol dependent, etc. The sisters of the victim and the siblings of the victim and the Petitioner testified at the habeas hearing that the Petitioner was a heavy drinker and that he generally did his drinking either every weekend or every other weekend.
However, the issue before this Court is not whether he was an alcoholic, but rather, whether he was drunk at the time he committed the murder. The Court concludes from the totality of the evidence that he was not drunk at the time of the murder for the following reasons:
1. In cross-examination of the Petitioner he stated that from sunrise of the day of the killing until the killing he had consumed a half a Pint of rum and two king-size beers, either 12 or 16 ounces. He testified that he had finished his consumption of alcohol no later than 12 noon of that day. He also testified that from 2:00 a.m. to 8:30 a.m. he had had nothing to drink. Taking the Petitioner at his word the Court finds that he did not consume alcohol from noontime until the time of the killing which was approximately 4:30 p.m. From this Court's trial experience particularly including trials of people charged with driving under the influence of alcohol, this Court concludes that any liquor consumed at 12 noon would have been out of the Petitioner's system by 4:30 p.m.
2. Petitioner stated that from 8:30 a.m. until the time of the stabbing he had nothing to eat. This is contradicted by the testimony of other CT Page 15941-fb witnesses. Widillie Nieves, sister of the victim, Maria Perez, testified in the habeas trial that the Petitioner came to her house between 10:30 a.m. and 11:00 a.m., stayed approximately 45 minutes and ate a ham and cheese sandwich that she had served him consisting of two slices of ham and one slice of cheese and, of course, the bread, and also consumed a regular coffee with milk. Another sister of the victim, Ms. Bultrago, testified that she was at 123 Marimac Road with her children, the victim and her children then living in a shelter because of the Petitioner's physical abuse, when the Petitioner arrived at approximately 12 noon, and about 12:30 p.m. she made him a ham and cheese sandwich which he ate. This Court also knows from its own experience in driving under the influence trials that consumption of food lessens the effect of alcohol in the system. Not only does this contradict Petitioner's claim to have been drunk at the time of the killing, but it also demonstrates that he lied when he said he had nothing to eat between 8:30 a.m. and the time of the killing. The Court finds the testimony of these two sisters of the victim credible.
3. There was also testimony from the Petitioner that when he was at Marimac Road at about 12 noon he did have a cup of black coffee.
4. Widillie Nieves testified that when he visited her apartment that day, she was sitting at the table with him probably no more than two to three feet away, and she did not smell alcohol on his breath. She testified that she had no reason to believe he was intoxicated.
5. Wendy Perez, daughter of Juan and Maria Perez, now at age twenty-three was approximately eleven or twelve years old when she visited her father in prison. She testified that at that time he stated to her, "I wasn't drunk. I just had the devil in me." She indicated that just before the killing she told her brother to hit the wall if anything happened because she would be in the next apartment. She heard her mother screaming and went to the apartment at which time the Petitioner stated to her and her siblings: "If you guys don't get out of here, I'll end up killing you." She said that he did have red eyes which he does have when he is drinking.
6. Juan Perez, son of Maria Perez and the Petitioner, now age twenty-four, testified that when he saw his father outside of the apartment downstairs, his father smelled of booze on his mouth but otherwise looked healthy. He also testified that even though he smelled an odor of alcohol, he, the son, knew that his father, the Petitioner, was not drunk at the time. He stated that he could tell through experience when his father was drunk, and he was not drunk just before he CT Page 15941-fc went into the apartment and killed his wife. When the son heard the commotion, he went into the apartment and saw his father stabbing the victim. He told him to stop, but the father wouldn't listen. He then threw a television remote instrument hitting his father in the head, but his father continued to stab the victim.
7. Ms. Bultrago also testified that after she had given the Petitioner a ham and cheese sandwich at approximately 12:30 p.m. at 123 Marimac Road, the Petitioner gave her a ride to her house. In the car and in the apartment she was within arms length of the Petitioner, smelled no odor of alcohol and found him to be perfectly normal. She would not have allowed him to drive her and her children back to the apartment if she thought he was drunk. He had no difficulty, according to her, driving his automobile. After they arrived back at her apartment, she called the victim at the shelter to confirm that the victim agreed to take the children and meet the Petitioner at the Marimac Road apartment for a goodbye and photographs before he was going to New York as he claimed. She drove her sister (the victim) back to Marimac Road. At this point, the Petitioner was outside. Ms. Bultrago went inside and told her sister that she was going back to her apartment to do laundry and for her sister to call her when the Petitioner leaves and that she would come back and pick her up. She waited and received a phone call from a neighbor of the victim at about 5:00 p.m. that her sister had been stabbed to death.
8. The New Britain police took a statement in writing from Mr. Fermin Barona, Respondent's Exhibit A. Mr. Barona stated that he had known the Petitioner for about a year and met him through a friend, Jimmy Ruiz, who lived at 125 Marimac Road in New Britain. He further stated that on January 28, 1989 he arrived in his Mercury Monarch at 125 Marimac Road at about 4:00 p.m. He stated that as he was waiting outside in his car, Jr. who is also known to him as Juan Perez, approached him and they started to talk. "Jr. sat down in my car and we started to talk. I needed cigarettes so I asked Juan if he wanted to go for a ride and we did. I went to a package store on Hillhurst Avenue, New Britain, Connecticut and then we returned to Marimac Road. While I was in the car with Jr. I didn't smell any liquor on his breath and Jr. didn't appear to be intoxicated or high. I offered to buy him meaning Jr. a bottle of liquor but Jr. said no and said he wasn't drinking anymore. . . . Jr. stated he was meeting Maria today to take pictures of the children. I returned to Marimac Road with Jr. . . . Juan gets out of my car and walks toward 123 Marimac Road. Jr.'s son Juan age about eleven meets Juan outside near my car. . . . About 5:00 p.m. we return from the car dealer and I parked in front of the apartment at 123 Marimac Road. I saw and heard Jimmy Ruiz' wife and daughter screaming and crying. . . . As I was parking the car I CT Page 15941-fd noticed that Jr. was walking in my direction and noticed that Jr. was carrying his brown colored coat . . ."
From the totality of the evidence, this Court finds that the murder occurred at approximately 5:00 p.m. at which point the alcohol Petitioner consumed that morning would have completely left his system.
9. The Petitioner also claimed that he was drunk when he gave his statement or confession to the New Britain police. This is contradicted by the fact that there is nothing in his statement to the police, Respondent's Exhibit B, that he had been drinking. He also clearly remembered that his wife, during the stabbing, had stated "Jr. don't do this." Officer Raynis of the New Britain Police Department stated at the habeas trial that when the Petitioner arrived at the New Britain Police Department there was no odor of liquor on his breath and no indication of intoxication. He did not appear to be tired, upset or concerned. Sergeant Carlos Burgos who translated for Detective Phillips and for Officer Raynis, testified that he saw the Petitioner on the first floor of the Police Department and thirty minutes later when he translated, the Petitioner was calm and wanted to talk. He showed no injuries. Burgos was two to three feet from the Petitioner and found no odor of alcohol, no indication of intoxication, no difficulty walking and no bloodshot eyes.[4] The Petitioner never said that he had been drinking. The Petitioner had no problem remembering the events to and during the stabbing but stated that he couldn't remember what happened after that. However, his statement does say: "I then recall dropping the knife in the kitchen and leaving the apartment through the rear door. I got into my vehicle, a brown chev. chevette and I drove to Hartford Conn. I went to my uncle's house in Hartford and from there I phoned the Hartford police to surrender myself for what I did."
Most, if not all of these witnesses stated that they gave statements to the police, and in view of the open file policy of the State's Attorney's Office, Attorney Moran had access to them. Petitioner's counsel asked each of the witnesses who testified at the habeas trial for the Respondent, other than the police officers, whether or not they had been contacted by Attorney Moran. They all replied in the negative. Perhaps, Attorney Moran should have contacted them. However, if he had read their statements, assuming they were similar to their testimony, he would have seen that all they did was incriminate his client rather than help his client. Further, there is no evidence that they would not have been able to testify. In view of all the evidence presented, it is clear to this Court that a defense of the Petitioner being under the influence of alcohol would not have been successful, and the only logical conclusion CT Page 15941-fe to be drawn from these facts is that Attorney Moran was aware that such a defense would be unsuccessful. Further, the Petitioner testified that Attorney Moran had told him that the offer from the State was twenty-five years to serve and that he was not told at that time by Attorney Moran that if he didn't accept the twenty-five years, the offer would be higher. of course, Attorney Moran was not available to testify in the habeas hearing, but State's Attorney Herbert Carlson who prosecuted the case in the criminal trial represented at the habeas trial that he never made an offer of twenty-five years, that the notes in his file would have reflected such an offer because any time an offer was made it was his policy and the policy of his office to put in writing what offer was made. The Court believes Attorney Carlson and cannot believe that Attorney Moran would have stated to the Petitioner that the offer was twenty-five years without some basis for it. These facts adversely affect the credibility of the Petitioner.
Attorney Moran was then faced with a client whose credibility could easily be questioned and whose record of domestic violence and prior time in jail[5] would be contradicted by his criminal record of being convicted of Assault in the Third Degree on July 31, 1983, being arrested on August 31, 1987 for Assault in the Third Degree and on December 25, 1988 for Assault in the Third Degree and Risk of Injury to a Minor, the latter no doubt being the Christmas Day assault in which the victim was taken to the hospital and about which incident the witnesses testified. These assaults were against his wife, Maria Perez.
 CONCLUSION 1. Ineffective Assistance of Counsel:
Attorney Moran was faced with a client who had committed murder and confessed to same and a client with a history of domestic abuse which would have been admitted into evidence if the client had taken the witness stand which he would have had to do if he pursued his claim of being intoxicated at the time of the killing. A psychologist and a psychiatrist had both interviewed the Petitioner, and their reports mention nothing about extreme emotional disturbance. The reports did say that the Petitioner was an alcoholic. However, there was overwhelming evidence that the Petitioner was not drunk at the time of the killing. Further, several false statements would have seriously undermined the Petitioner's credibility. In view of the situation in which Attorney Moran found himself, he served his client very well by negotiating a plea bargain of forty years with a right to argue for less. If his client had gone to trial, there is little doubt that he would have been convicted of CT Page 15941-ff murder with a maximum sentence of sixty years. Therefore, the Court finds the Petitioner has not satisfied his burden of establishing that his counsel's performance was deficient and below the standard of criminal defense attorneys in the area. The Petitioner, therefore, failed to establish the first prong of Strickland v. Washington, supra.[6]
 2. Would the Results of the Trial have been Different?
 Strickland v. Washington, supra states: "Even if a Petitioner shows that counsel's performance was deficient, the second or prejudice prong requires that the Petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result in the proceeding would have been different." The Petitioner has failed to sustain his burden of proving that the result of the proceeding would have been different in his favor. In fact, this Court has already found that counsel's performance was not deficient, but assuming arguendo that it was, this Court finds that if the Petitioner had gone to trial, he would have been convicted of murder and probably would have received a much higher sentence than the thirty-eight year sentence that he did receive. The Petitioner has, therefore, not proven the second (prejudice) prong of Strickland v. Washington, supra.
For the foregoing reasons and based upon the totality of the evidence, the petition for habeas corpus is denied.
Rittenband, JTR